## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

_____
                                          )
PETER C. FAERBER,                         )
                                          )
                    Plaintiff,            )          No. 20-509C
                                          )
           v.                             )          Filed: November 1, 2021
                                          )
THE UNITED STATES,                        )
                                          )
                    Defendant.            )
_____)

## OPINION AND ORDER

Plaintiff LtCol Peter C. Faerber alleges that the United States Marine Corps ("USMC") improperly separated him from active duty while he was in a medical hold status due to injuries sustained in the line of duty. Before the Court is Plaintiff's Motion for Judgment on the Administrative Record and Defendant's Combined Motion to Dismiss and Cross-Motion for Judgment on the Administrative Record. For the foregoing reasons, the Court **GRANTS** Plaintiff's Motion and **DENIES** Defendant's combined Motion.

## BACKGROUND

### I.       Findings of Fact

Plaintiff is a lieutenant colonel in the United States Marine Corps Reserve ("USMCR"). Commissioned in the USMCR on December 20, 1992, Plaintiff initially served as a pilot on active duty from 1993 until December 30, 2002. *See* Admin. R. ("AR") at 274–75, 282, 376, ECF No. 6. After completing his initial active duty commitment, Plaintiff attended law school, graduating in 2006. *Id.* at 273, 274. In 2007, the USMCR placed Plaintiff on active duty while he attended the Naval Justice School in Newport, Rhode Island. *Id.* at 274. Plaintiff completed Naval Justice School and was designated a Judge Advocate in August 2007. *Id.* at 274, 350. Plaintiff then

accepted a series of mobilization orders that placed him on active duty assignments through 2014, serving for several years during that time as a Disability Evaluation System ("DES") Attorney and the Officer in Charge of the USMC Wounded Warrior Battalion-East assigned to Detachment Landstuhl Regional Medical Center, Wounded Warrior Regiment, Headquarters United States Marine Corps ("HQMC"). *Id.* at 274, 360.

In August 2015, Plaintiff engaged in discussions with HQMC personnel regarding new mobilization orders to fill the USMC's need for a DES Attorney. *Id.* at 6. Part of those discussions included consideration of the potential need for Plaintiff to execute 1095 Rule, High Active Duty Time ("HADT"), and sanctuary waivers.[1] *Id.* According to Plaintiff, he had previously executed a HADT waiver, and he and an HQMC representative agreed that neither a 1095 Rule waiver nor sanctuary waiver was necessary for the issuance of new orders. *Id.* As a result, in September 2015, HQMC issued Plaintiff mobilization orders pursuant to 10 U.S.C. § 12301(d) without asking him to submit any additional waivers. *Id.* at 428–34.

In accordance with those orders, Plaintiff was ordered to a period of active duty totaling 183 days, from October 1, 2015 to March 31, 2016, in support of Operation Freedom Sentinel. *Id.* at 428. The orders directed Plaintiff to report to Camp Pendleton, California, where he would be permanently stationed as a DES Attorney. *Id.* HQMC required Plaintiff to certify his acceptance of the orders. *Id.* at 433–34. As part of the requisite certification, Plaintiff acknowledged that he "may become eligible for sanctuary zone protection" under 10 U.S.C. § 12686(a). *Id.* at 433.

---

[1] Although not at issue in Plaintiff's case, the "1095 Rule" pertains to reservists who serve more than 1,095 days on active duty in a 1,460-day period. *See* Active Duty for Operational Support (ADOS) in Support of the Total Force, Marine Corps Order ("MCO") 1001.59A, ch. 2, ¶ 5.e. (2011). HADT refers to a period of total active duty time exceeding 16 years. *See* Policy and Procedures for Reserve Component (RC) Member Service Beyond 16 Years of Active Duty Service, MCO 1800.11, ch. 1, ¶ 1.b. (2009).

In December 2015, Plaintiff was placed on light duty after injuring his lower back and knees while preparing for a USMC Combat Fitness Test. *Id.* at 62–75. Upon further evaluation, his USMC physician diagnosed Plaintiff with Lumbar Degenerative Disc Disease, prescribed physical therapy and chiropractic treatment, and placed him on limited duty for an initial period of six months starting on March 21, 2016. *Id.* at 88–92, 113. To facilitate his ongoing medical treatment, the Reserve Medical Entitlements Determination Section (hereinafter Benefits Issuing Authority ("BIA")) approved Plaintiff's placement on "Medical Hold" beginning on April 1, 2016—the day after his original active duty orders were scheduled to end. *Id.* at 37, 43–44. On March 29, 2016, Plaintiff received counseling regarding his Medical Hold and signed an administrative counseling form signifying his understanding that his mobilization orders were subject to modification "in correlation with [his] limited duty status," including "reduction/extension to the active duty period (IAW SECNAVINST 1770.3)" and that "[u]pon [his] return to duty [he would] release from active duty within 10 working days." *Id.* at 205.

HQMC modified Plaintiff's original mobilization orders on April 18, 2016, extending his time on active duty to September 1, 2016. *Id.* at 435. The modified orders reflected a total period of active duty of 337 days and stated that the modification became part of Plaintiff's original orders and "[a]ll other provisions of the original orders remain[ed] the same." *Id.* at 435, 437. This represented the first of a series of modifications to Plaintiff's original mobilization orders. The second modification occurred on August 23, 2016, extending Plaintiff's time on active duty to September 21, 2016, and reflecting a total period of active duty of 357 days. *Id.* at 438. Identical to the first modification, the second modified orders provided that the modification became part of Plaintiff's original orders and "[a]ll other provisions of the original orders remain[ed] the same."

*Id.* at 439.   The second modification synchronized Plaintiff's active duty end date with the expiration date of Plaintiff's Medical Hold.

Despite treatment, Plaintiff's injuries did not improve to permit him to return to full duty, and, as such, his physician recommended a Medical Evaluation Board ("MEB") in September 2016.   *Id.* at 176–77.   On September 19, 2016, the BIA approved an extension of Plaintiff's Medical Hold to March 21, 2017.   *Id.* at 40, 43–44.   The following day, the HQMC Force Augmentation Section ("MMIB-2") notified Plaintiff that HQMC was willing to extend his mobilization orders to January 31, 2017.   *Id.* at 238.   This put Plaintiff near 18 years of active duty time, which he would reach on March 25, 2017.   *Id.* at 266.   As such, HQMC requested that Plaintiff submit a sanctuary waiver as early as possible to permit any further extension of his mobilization orders.   *Id.* at 238.   HQMC advised Plaintiff that it would not extend his mobilization orders beyond March 21, 2017 without Plaintiff first submitting a sanctuary waiver.   *Id.*

In January and February 2017, HQMC exchanged numerous emails both internally and with Plaintiff on the waiver issue.   *Id.* at 239–59.   When Plaintiff inquired as to the basis for the waiver requirement's application to his orders, HQMC asserted that Marine Corps Order ("MCO") 1001.61A, as well as MCO 1800.11, provided the authority to require Marines on Medical Hold to waive sanctuary protections prior to the issuance of follow-on mobilization orders.   *See, e.g., id.* at 239, 243–44.   Plaintiff refused to submit a sanctuary waiver and stated his position that the USMC lacked legal authority to require a reservist on Medical Hold to waive congressionally-directed sanctuary protections.   *See, e.g., id.* at 250.   Notwithstanding multiple emails discussing their opposing views on the USMC's Medical Hold and waiver authorities, and Plaintiff's attempt

to obtain "higher-level attention on the issue of Medical Hold/Orders," *id.* at 256, neither party relented.[2]

In the meantime, HQMC issued three additional modifications to Plaintiff's mobilization orders on September 20, 2016, January 30, 2017, and February 27, 2017, extending his period of active duty to February 1, 2017, then February 28, 2017, and finally March 21, 2017, respectively. *Id.* at 441, 444, 447. Based on a recommendation made by the legal counsel of the Deputy Commandant of Manpower and Reserve Affairs ("DC M&RA"), the final modification aligned Plaintiff's mobilization orders with the extension of his Medical Hold. *Id.* at 259, 278–79. Each modification increased Plaintiff's days of active duty, *i.e.*, 490 days, 517 days, and ultimately 538 days. *Id.* at 441, 444, 447. Just as in the first two instances, these modified orders all provided that each modification became part of Plaintiff's original orders and "[a]ll other provisions of the original orders remain[ed] the same." *Id.* at 442, 446, 448. Without any additional extensions or modifications to his latest mobilization orders, however, Plaintiff was released from active duty on March 21, 2017. The USMC did not request that Plaintiff sign a Release from Active Duty

---

[2] The tenor of the emails between HQMC and Plaintiff is notable in two ways that warrant a brief aside. First, contrary to Plaintiff's characterization, *see* Pl.'s Mot. for J. on Admin. R. at 30, ECF No. 10, the emails convey HQMC's general concern for Plaintiff staying on active duty orders to coincide with his Medical Hold, while also complying with USMC sanctuary-waiver policies it believed were applicable. *See, e.g.*, AR 242 (email from MMIB-2 representative to Plaintiff stating, "I don't want you to fall off orders and I want to make sure we push your current set of orders out far enough to allow for your waiver of sanctuary to process."). Second, contrary to Defendant's characterization, *see* Def.'s Mot. to Dismiss & Cross-Mot. for J. on Admin R. at 11, ECF No. 11, the emails do not evince an intent by Plaintiff to inappropriately leverage his Medical Hold status to obtain a regular retirement but rather show that he asserted a principled position on the legal authority for HQMC's actions. *See, e.g.*, AR 245 (email from Plaintiff to same MMIB-2 representative stating, "I'm not trying to be difficult about it. It's just that as one of the USMC's [subject matter experts] on Disability Law, I haven't seen anything indicating that there's a need for a waiver in my case."). As so often happens in litigation, a party's past actions may be perceived (or at least portrayed to the court) by an opposing party in the most unfavorable light. In this case, the circumstances seem best described as "a difference in professional opinion[.]" *Id.* at 253; *see id.* at 256.

5

Against Medical Advice form prior to his separation from active duty and the termination of his Medical Hold because the BIA did not believe Plaintiff "elect[ed] to be released from a medical hold status." *Id.* at 9, 212. On March 23, 2017, after he was released, Plaintiff indicated in an email to MMIB-2 that he intended to submit the necessary paperwork, including a sanctuary waiver, to enter back on active duty for the purpose of Medical Hold under new orders. *Id.* at 261–63. He stated that his reluctance to submit a sanctuary waiver while serving on his previous orders was the result of his belief that requiring the waiver on such orders was unlawful. *Id.* at 262.

At the same time Plaintiff and HQMC were discussing the need and propriety of a sanctuary waiver, Plaintiff continued to move through the disability evaluation process. On March 7, 2017, the MEB determined Plaintiff was unlikely to return to full duty and referred Plaintiff's case to the Physical Evaluation Board ("PEB") for a final determination. *Id.* at 481, 487. An informal PEB convened on March 9, 2017. *Id.* at 461. As of March 17, 2017, the BIA determined that Plaintiff "[met] the criteria for continuation in a medical hold status."[3] *Id.* at 265. On March 23, 2017, after his separation, the informal PEB determined Plaintiff was fit for active duty. *Id.* at 459. Plaintiff received the findings of the informal PEB on March 30, 2017. *Id.* at 451. He accepted them and waived his right to a formal PEB on April 10, 2017. *Id.* at 451–58. In a letter dated April 17, 2017, the PEB notified the Commandant of the USMC that Plaintiff had been found

_____

[3] On March 21 and April 3, 2017, Plaintiff received emails reflecting approvals of his Medical Hold. AR 29–30. These emails appear to be merely the result of auto-generated messages. *See id.* (emails sent from "dm.alerts@manpower.usmc.mil"); *id.* at 41 (BIA comment entered on March 21, 2017, stating, "As the member has not submitted a [HADT] waiver w/Waiver of Sanctuary Eligibility to MMIB-2, his medical hold benefits have expired as of 21 March 2017. Next routing is a change status inactive request to properly close the case in MCMEDS."); *id.* at 42 (noting that change status inactive request was approved on April 3, 2017); *id.* at 261 (email from Plaintiff to MMIB-2 representative stating, "I saw via auto-message (dm-alerts) that [my Medical Hold letter] was approved on the 21st, and then cancelled on the 22nd after my EAS passed.").

fit for active duty and requested appropriate action be taken to "continue [Plaintiff] on active duty until such active duty is terminated under other provisions of law or regulation." *Id.* at 450.

On June 5, 2017, Plaintiff received a letter dated April 3, 2017, from the BIA that notified him of the termination of his Medical Hold at the direction of the Commandant of the USMC effective March 21, 2017. *Id.* at 7, 12–13. Plaintiff appealed the termination of Medical Hold on June 30, 2017. *Id.* at 7–11. In a response dated September 29, 2017, the BIA explained that the Commandant of the USMC disapproved Plaintiff's continuation in a Medical Hold status due to Plaintiff's failure to adhere to service policy by refusing to execute a sanctuary waiver to remain on active duty while in a Medical Hold status. *Id.* at 49. Plaintiff appealed the BIA's denial to the Department of the Navy's Office of the Judge Advocate General ("OJAG") on October 6, 2017. *Id.* at 3–4. OJAG denied Plaintiff's appeal on December 28, 2018. *Id.* at 206–14. OJAG found that Plaintiff did not prove by a preponderance of the evidence that the BIA improperly terminated his Medical Hold because the termination resulted from Plaintiff voluntarily separating from active duty by refusing to submit a sanctuary waiver to obtain follow-on mobilization orders. *Id.* at 208–11. Although it found that the BIA erred in determining that Plaintiff was not required to complete a release against medical advice form prior to separation from active duty, OJAG concluded such error was harmless because Plaintiff acknowledged that, if offered, he would not have signed the form. *Id.* at 214.

## II. Statutory and Regulatory Framework

### A. Active Duty Authorities

Section 12301 of Title 10 defines the authority of the Secretary concerned to order reserve component members to active duty. As relevant here, § 12301(d) provides that, "[a]t any time, an authority designated by the Secretary concerned may order [a reservist] under his jurisdiction to

active duty, or retain him on active duty, with the consent of that member." 10 U.S.C. § 12301(d).

Section 12301(h) permits the Secretary of a military department, when authorized by the Secretary

of Defense, to order a reservist to active duty or retain a reservist on active duty for purposes of

authorized medical care or disability evaluation "with the consent of the member." *Id.*

§ 12301(h)(1); *see id.* § 12301(h)(2).

This authority is implemented by Department of Defense Instruction ("DoDI") 1241.01

and DoDI 1332.18, which both mandate the retention of certain reservists, with their consent, on

active duty for the purpose of completing the disability evaluation process.  Specifically, DoDI

1241.01 provides:

> 3. <u>POLICY</u>. It is [Department of Defense ("DoD")] policy that: . . .
>
> (2) When an RC [("Reserve Component")] Service member is on active duty (AD)
> . . . for a period of more than 30 days and, at the scheduled end of that period, has
> an unresolved in-LOD ["Line of Duty"] condition that may render the member unfit
> for duty under the Disability Evaluation System (DES), but this has not yet been
> determined by the DES, the member:
> (a) *Will*, with his or her consent, be retained on AD . . . until:
> 1. Outstanding in-LOD conditions are resolved; or
> 2. He or she is either found fit for duty, separated, or retired as a result of a DES
> finding.

Reserve Component (RC) Line of Duty Determination for Medical and Dental Treatments and

Incapacitation Pay Entitlements, DoDI 1241.01, ¶ 3 (2016) (emphasis added).  The instruction

recognizes that a reservist "[m]ay elect to be released from active duty before resolution of the

conditions or completion of the DES process."  *Id.* ¶ 3.a.(2).(b).  DoDI 1332.18 employs almost

identical language, stating DoD's policy that "RC Service members on active duty orders

specifying a period of more than 30 days will, with their consent, be kept on active duty for

disability evaluation processing until final disposition by the Secretary of the Military Department

concerned."  Disability Evaluation System (DES), DoDI 1332.18, ¶ 3.h. (2014).  The instruction

likewise provides a reservist with the ability to choose to leave active duty before completion of DES processing. *Id.*

The Navy and USMC have issued additional policy instructions relevant to the retention of reservists in the DES process. Secretary of the Navy Instruction ("SECNAVINST") 1770.3D substantially mirrors the language of DoDI 1241.01 and DoDI 1332.18 but is phrased permissively rather than as mandatory policy. *See* Management and Disposition of Incapacitation and Incapacitation Benefits for Members of Navy and Marine Corps Reserve Components, SECNAVINST 1770.3D, ¶ 3 (2006) ("[M]embers, with their consent, *may* also be ordered to, or continued on, active duty to complete authorized medical care, be medically evaluated for disability or to complete a required Department of Defense healthcare study. . . ." (emphasis added)). The instruction defines Medical Hold status as the "[r]etention of reservists on active duty to receive medical treatment for service-connected injuries, illnesses and/or diseases until determined Fit for Duty by the BIA Senior Medical Officer (SMO) and/or Medical Status Review Officer (MSRO), or until final disposition is determined by the PEB."[4] *Id.* ¶ 6.m. It further sets forth the Medical Hold process, which begins with a determination by the BIA that a reservist should be placed in the Medical Hold program subject to the reservist's eligibility and "[c]onsent to remain or be placed on active duty for incapacitation or [DES] adjudication." *Id.* ¶ 8.b.(2). For reservists "who decline to accept or continue on active duty" under Medical Hold, SECNAVINST

---

[4] "Fit for Duty" is a "pronouncement by a Military physician or by a [MEB] that a service member previously on light or limited duty has healed from the injury, illness, or disease that necessitated the member's serving in a medically restricted duty status." SECNAVINST 1770.3D, ¶ 6.e. "Fit for Continued Naval Service" is a "finding made exclusively by the Department of the Navy's PEB indicating that the service member is reasonably able to perform the duties of his or her office, grade, rank or rating." *Id.* ¶ 6.f.

1770.3D directs the BIA to complete a "Release from Active Duty Against Medical Advice" form. *Id.* ¶ 8.h.

At the USMC level, Marine Administrative Message ("MARADMIN") 259/04, like DoDI 1241.01 and DoDI 1332.18, mandates the retention of certain injured Marines on active duty. *See* Policy Guidance for Activated Reservists (IRR/IMA/SMCR) and Retirees Who Have Incurred or Aggravated Medical Conditions While on Active Duty, MARADMIN 259/04, ¶ 3.D. (2004) ("Marines activated for a period of more than 30 days [who become sick, injured, or aggravate an existing medical condition] . . . *will* be retained on active duty until they are fit for duty, or had their medical status reviewed by the SMO . . . and/or processed through the DES. . . ." (emphasis added)). Although not explicitly referencing the consent requirement, the policy guidance acknowledges the choice of a Marine to be (or not to be) placed on Medical Hold. *Id.* ¶ 5. It further defines Medical Hold as a "convenience of the government" and "temporary status in which a Marine is placed when required to remain on active duty beyond the Marine[']s [end of active service or expiration of current contract ("EAS/ECC")] to complete medical treatment, or prepare for a MEB or [PEB]." *Id.* ¶ 2.C.

### B. Sanctuary Authorities

Section 12686 of Title 10 prohibits—except by approval of the Secretary concerned—the involuntary release of reservists, who are on active duty under non-training orders and within two years of eligibility for retired pay, prior to those reservists becoming eligible for that pay. 10 U.S.C. § 12686(a). This two-year period after a reservist accumulates 18 years active duty time is commonly referred to as "sanctuary." *See* Policy and Procedures for Reserve Component (RC) Member Service Beyond 16 Years of Active Duty Service, SECNAVINST 1800.2, ¶ 2 (2008). Sanctuary protection is not guaranteed. The statute provides the Secretary concerned with

authority to require sanctuary-eligible reservists, as a condition of certain active duty orders, to waive the applicability of § 12686(a) for the period of active duty covered by those orders. 10 U.S.C. § 12686(b). The application of this authority is expressly limited to "a member of a reserve component who is to be ordered to active duty (other than for training) under section 12301 of this title pursuant to an order to active duty that specifies a period of less than 180 days and who (but for this subsection) would be covered by subsection (a)." *Id.* The statute provides the service branch Secretary not only with discretion to decide whether to require waiver at all but also to determine the timing of the execution of any waiver. The Secretary "may require that a waiver . . . be executed before the period of active duty begins." *Id.*

The Navy and USMC have issued numerous policies and other guidance documents related to sanctuary waiver, including order-issuance and approval processes designed to ensure that reservists "who meet or exceed 18 years of active duty do so by design and are planned, budgeted additions to the Total Force." SECNAVINST 1800.2, ¶ 3; *see* Policy and Procedures for Reserve Component Sailors Service Beyond 16 Years of Active-Duty Service, Office of the Chief of Naval Operations Instruction ("OPNAVINST") 1001.27, ¶ 1 (2013) (ensuring "all entry into sanctuary or earning of a regular retirement is the result of planned actions necessary to meet the needs of the Navy"). MCO 1800.11 provides for the management of Marine reservists who are beyond 16 years of active duty service or within two years of becoming eligible to enter sanctuary. *See* Policy and Procedures for Reserve Component (RC) Member Service Beyond 16 Years of Active Duty Service, MCO 1800.11, ¶ 1 (2009). That order designates the DC M&RA as "the sole approval authority for all [Marine reservists] to . . . exceed 18 active duty years and enter into AD [active duty] sanctuary." *Id.*, ch. 1, ¶ 3.b. It provides that any active duty order for a Marine reservist that has an end of active service date that would accumulate 18 or more years of active duty time for

the reservist must be approved by the DC M&RA and that such order "shall not be issued to any [reservist] without a sanctuary request approved in accordance with this order." *Id.* ¶ 4.k.1.  The regulation allows for reservists to request active duty orders that would result in serving 18 years or more on active duty but only "contingent upon executing a waiver of sanctuary protection." *Id.* ¶ 12.  Pursuant to § 12686(b), the policy mandates that "[o]rders requiring waiver of sanctuary protection must be for 179 days or less and pursuant to authority of 10 U.S.C. 12301," *id.* ¶ 12.a., and that any waiver must be provided in writing "prior to executing the orders providing for 18 or more total active duty years," *id.* ¶ 12.b.; *see* Waiver of Sanctuary Protection, MARADMIN 104/13, ¶ 4.C. (requiring that all active duty orders that would result in a reservist reaching 18 years of active duty service "be accompanied with a waiver of sanctuary protection" and "shall not exceed 179 days in length").

MCO 1001.61A provides policy guidance on the application of sanctuary waiver to reservists on Medical Hold.  *See* Policy and Procedures for Sourcing Personnel to Meet Individual Augmentation (IA) Requirements, MCO 1001.61A, ch. 3, ¶ 7 (2013).  According to that order, if a reservist's "initial placement or subsequent extension" on Medical Hold will cause him or her to exceed 18 years of active duty service, then the DC M&RA "can withhold the issuance of [active duty] orders if the reservist fails to execute a waiver of sanctuary eligibility as part of their consent to be continued on active duty for medical observation, evaluation or treatment." *Id.*  The policy guidance cites as authority for this statement a November 19, 2012 legal opinion drafted by the USMC's Judge Advocate Division at the request of MMIB-2 ("JAD Memo").  *See* AR 217–18.

## III.    The Instant Action

Plaintiff filed suit in this Court on April 27, 2020.  Pl.'s Compl., ECF No. 1.  On August 21, 2020, Plaintiff filed his Motion for Judgment on the Administrative Record, arguing that the

Court should reverse the termination of his Medical Hold, restore him to active duty in the USMC, declare that he would have properly entered sanctuary but for his unlawful separation, and award him all retroactive pay and allowances to which he would have been entitled had his Medical Hold not been terminated. *See generally* Pl.'s Mot. for J. on Admin. R., ECF No. 10. Defendant filed a combined Motion to Dismiss and Cross-Motion for Judgment on the Administrative Record on September 11, 2020. Defendant requests that the Court dismiss Plaintiff's Complaint or, alternatively, grant the United States judgment on the basis that the USMC acted lawfully in declining to further extend Plaintiff's active duty orders after he refused to waive his sanctuary protections. *See generally* Def.'s Mot. to Dismiss & Cross-Mot. for J. on Admin R., ECF No. 11.

## LEGAL STANDARDS

### I.    RCFC 12(b)(6)

A complaint may be dismissed for "failure to state a claim upon which relief can be granted." R. 12(b)(6), Rules of the United States Court of Federal Claims ("RCFC"). To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter," thereby providing "facial plausibility" to a plaintiff's claims. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* Although a "court must accept well-pleaded factual allegations as true and must draw all reasonable inferences in favor of the claimant," *Call Henry, Inc. v. United States*, 855 F.3d 1348, 1354 (Fed. Cir. 2017), "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to shield a complaint from dismissal, *Iqbal*, 556 U.S. at 678.

## II.     RCFC 52.1

Motions for judgment on the administrative record are governed by RCFC 52.1.  RCFC

52.1(c).  Such motion is "properly understood as . . . an expedited trial on the record."  *Bannum,*

*Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005).  In contrast to the standard for summary

judgment, "the standard for judgment on the administrative record is narrower" and involves

determining, "given all the disputed and undisputed facts in the administrative record, whether the

plaintiff has met the burden of proof to show that the [challenged action or] decision was not in

accordance with the law."  *Martinez v. United States*, 77 Fed. Cl. 318, 324 (2007) (citing *Bannum*,

404 F.3d at 1357).  Therefore, a genuine issue of disputed fact does not prevent the Court from

granting a motion for judgment on the administrative record.  *See Bannum*, 404 F.3d at 1357.

## III.    Standard of Review in Military Pay Cases

In military pay cases, the scope of judicial review is deferential and is limited to

determining whether an action or decision by the military was "arbitrary, capricious, or in bad

faith, or unsupported by substantial evidence, or contrary to law."  *Doe v. United States*, 132 F.3d

1430, 1434 (Fed. Cir. 1997) (quoting *Heisig v. United States*, 719 F.2d 1153, 1156 (Fed. Cir.

1983)); *see Martinez v. United States*, 333 F.3d 1295, 1314 (Fed. Cir. 2003) (noting that arbitrary-

and-capricious review is applied in suits challenging underlying discharge actions as well as the

decisions of military correction boards).  The Court's review is limited to the administrative record.

*Metz v. United States*, 466 F.3d 991, 998 (Fed. Cir. 2006).  Therefore, the record must contain

evidence of legal error or deficiency in the decision-making process, meriting judicial relief and

"overcom[ing] the strong, but rebuttable, presumption that the administrators of the military, like

other public officers, discharge their duties correctly, lawfully, and in good faith."  *Doe*, 132 F.3d

at 1434 (quoting *Sanders v. United States*, 594 F.2d 804, 813 (Ct. Cl. 1979)).  The burden is on

the plaintiff to prove such error through "cogent and clearly convincing evidence." *Wronke v. Marsh*, 787 F.2d 1569, 1576 (Fed. Cir. 1986) (quoting *Dorl v. United States*, 200 Ct. Cl. 626, 633 (1973), *cert. denied*, 414 U.S. 1032 (1973)).

Beyond the presumption that military administrators lawfully discharge their duties, "[j]udicial deference must be 'at its apogee' in matters pertaining to the military and national defense." *Voge v. United States*, 844 F.2d 776, 779 (Fed. Cir. 1988) (quoting *Rostker v. Goldberg*, 453 U.S. 57, 70 (1981)); *see Murphy v. United States*, 993 F.2d 871, 872 (Fed. Cir. 1993) ("Justiciability is a particularly apt inquiry when one seeks review of military activities."). Nevertheless, not every claim arising from a military decision is beyond judicial review. *Adkins v. United States*, 68 F.3d 1317, 1323 (Fed. Cir. 1995). Even where Congress provides unlimited discretion, the military is "bound to follow its own procedural regulations if it chooses to implement some." *Murphy*, 993 F.2d at 873 (citing *Sargisson v. United States*, 913 F.2d 918, 921 (Fed. Cir. 1990)); *see Fisher v. United States*, 402 F.3d 1167, 1177 (Fed. Cir. 2005); *see also Voge*, 844 F.2d at 779 ("[T]he Claims Court may review the [challenged decision] process for compliance with established procedures."). Accordingly, where procedural violations are alleged, "this [C]ourt does not improperly exercise any discretion reserved for the military" but rather determines only whether the challenged action violated applicable statutory and regulatory standards. *Adkins*, 68 F.3d at 1323.

## DISCUSSION

## I.   Plaintiff Sufficiently Alleges That His Separation from Active Duty Was Involuntary.

To establish the Court's jurisdiction, Plaintiff relies on the Military Pay Act, 37 U.S.C § 204, as the relevant money-mandating statute. "[T]he Military Pay Act 'provides for suit in [the Claims Court] when the military, in violation of the Constitution, a statute, or a regulation, has

15

denied military pay.'"  *See Antonellis v. United States*, 723 F.3d 1328, 1331 (Fed. Cir. 2013) (alteration in original) (quoting *Dysart v. United States*, 369 F.3d 1303, 1315 (Fed. Cir. 2004)). Defendant moves for the Court to dismiss Plaintiff's Complaint pursuant to RCFC 12(b)(6) for failure to state a claim.[5]   Defendant characterizes Plaintiff's separation from active duty as voluntary because he refused to submit a waiver of sanctuary to allow further extension of his orders and, as a result, was released from active duty upon the expiration of his orders.  ECF No. 11 at 11.  It argues, therefore, that Plaintiff may not pursue a claim under the Military Pay Act.  *Id.* at 13.

Military Pay Act claims require that a plaintiff's discharge or retirement from military service be involuntary.  *Metz*, 466 F.3d at 998.  "[I]f the service member's separation from the service is voluntary, such as pursuant to a voluntary retirement, the Military Pay Act does not impose on the government any continuing obligation to pay the service member."  *Smith v. Sec'y of the Army*, 384 F.3d 1288, 1295 (Fed. Cir. 2004); *see Moyer v. United States*, 190 F.3d 1314, 1319 (Fed. Cir. 1999) (observing "the common sense notion that one who voluntarily gives up any right to compensation and benefits cannot later claim entitlement to such").  While courts initially viewed voluntariness as a jurisdictional issue, it is now well settled that the question of whether a service member voluntarily separated from active duty goes directly to the merits of a claim brought under the Military Pay Act.  *See Metz*, 466 F.3d at 998.

---

[5]    Defendant initially moved to dismiss the Complaint for lack of subject-matter jurisdiction.  *See* ECF No. 11 at 8–10.  It subsequently acknowledged, in response to arguments raised in Plaintiff's opposition, that the issue of voluntariness in the context of a service member's separation from the military is properly assessed under RCFC 12(b)(6).  *See* Def.'s Reply at 1–3, ECF No. 15.  After reviewing the relevant case law, the Court agrees and will construe Defendant's motion as a request to dismiss for failure to state a claim upon which relief can be granted.

Courts generally presume a resignation or retirement to be voluntary. *See Carmichael v. United States*, 298 F.3d 1367, 1372 (Fed. Cir. 2002). The presumption of voluntariness also logically "extend[s] to a military service member's honorable discharge upon the expiration of the terms of his enlistment where the member refuses to execute an authorized re-enlistment contract." *Id*. Separation from active duty, however, can be understood as involuntary if obtained under duress or coercion. *See id.* In order to establish that an otherwise voluntary discharge was the product of duress or coercion, a plaintiff "must demonstrate that: (1) he involuntarily accepted the terms of the government; (2) circumstances permitted no other alternative; and (3) said circumstances were the result of the government's coercive acts." *Id.* (citing *Christie v. United States*, 518 F.2d 584, 587 (Ct. Cl. 1975)). This three-part assessment has been referred to, on at least one occasion, as the *Carmichael* test. *See Sommers v. United States*, 149 Fed. Cl. 529, 537 (2020).

In *Carmichael*, the plaintiff, a Chief Petty Officer in the Navy, requested a reenlistment extension but refused on religious grounds to execute the reenlistment contract because it identified him by his social security number. *Carmichael*, 298 F.3d at 1371. The Navy declined to provide an accommodation and, as a result, the plaintiff was honorably discharged when his enlistment expired. *Id.* The Federal Circuit vacated the dismissal of the plaintiff's case and remanded the matter back to the lower court to determine whether the Navy wrongfully failed to follow its religious accommodation policies with respect to the plaintiff's reenlistment, thereby making plaintiff's "voluntary" retirement potentially coerced. *Id.* at 1376. As *Carmichael* held, government conduct not in adherence with its own rules and regulations may qualify as coercive, rendering a discharge involuntary. *See id.* at 1372; *see also Roskos v. United States*, 549 F.2d 1386, 1389–90 (Ct. Cl. 1977) ("An action is not voluntary if it is produced by government conduct

which is wrongful."). In assessing whether government conduct constitutes coercion, a court must objectively evaluate all the facts and circumstances. *Carmichael*, 298 F.3d at 1372.

With respect to the first prong of the *Carmichael* test, Plaintiff has sufficiently pled facts indicating that he involuntarily accepted the terms of the USMC. The USMC offered to extend Plaintiff's active duty orders to align with the extension of his Medical Hold but demanded that he waive sanctuary as a condition of the extension orders. *See* Compl., Ex. 10 at 34, ECF No. 1-2 (Email from MMIB-2 representative to Plaintiff). Plaintiff alleges that he "desired to remain on active duty until his PEB proceedings were resolved" and was "surprised" by the decision to terminate his active duty status. ECF No. 1 ¶¶ 77, 78. Just as the plaintiff in *Carmichael*, Plaintiff does not claim that he "tender[ed] his resignation or indicate[d] in any way that he desired to be separated from the Navy." *See Carmichael*, 298 F.3d at 1376 (quoting without citation the plaintiff's argument in the lower court). Put another way, Plaintiff alleges that—had he not been unlawfully required to waive sanctuary—he would have agreed to remain on active duty orders. *See id.* at 1377.

The Complaint also contains sufficient facts alleging that Plaintiff's circumstances permitted no other alternative, satisfying the second prong of the *Carmichael* test. The USMC presented Plaintiff with no other option for him to continue serving on active duty orders past March 21, 2017. *See* ECF No. 1-2 at 34. Plaintiff therefore faced a binary choice: submit a sanctuary waiver that he believed to be unlawful or face separation from active duty upon the expiration of his latest mobilization orders.

The third prong—and arguably the most demanding element—of the *Carmichael* test involves determining whether the government conduct in this case rises to the level of coercion or duress. Defendant maintains that the USMC violated no law or regulation by allowing Plaintiff's

active duty orders to expire after Plaintiff failed to consent to what Defendant argues was a lawful condition of the USMC's offer to extend his active duty orders.  ECF No. 11 at 16.  Plaintiff, however, alleges the USMC violated various statutory and regulatory authorities by failing to retain him on active duty until his fitness for duty was determined by the PEB and by unlawfully requiring a sanctuary waiver for an extension of his orders.  *See, e.g.*, ECF No. 1 ¶¶ 53, 76.

Deciding whether the USMC was obligated to continue Plaintiff on active duty for the purpose of Medical Hold or whether the USMC lawfully exercised its statutory sanctuary waiver authority goes directly to the merits of Plaintiff's case.  As the Federal Circuit made clear in *Metz*, on a motion to dismiss, courts are to analyze whether a plaintiff has asserted a claim of involuntary separation from the military.  *Metz*, 466 F.3d at 998 (holding that a plaintiff "must assert and ultimately establish that his separation was involuntary," and the Could should consider the question of voluntariness "in the context of the merits of a plaintiff's case").  Here, the Court is satisfied that Plaintiff has pled facts providing facial plausibility for his claim, thus saving his Complaint from dismissal pursuant to RCFC 12(b)(6).  Moreover, because both parties have moved for judgment on the administrative record, the Court has the present opportunity to answer the merits of the questions raised by the third prong of the *Carmichael* test.  Accordingly, Defendant's Motion to Dismiss is denied.

## II.    The Parties' Cross-Motions for Judgment on the Record

Resolving Plaintiff's claim on the merits requires the Court to navigate the intersection between two separate lines of military regulations: one that in certain circumstances requires a reservist to be placed or remain on active duty until he completes medical treatment or disability evaluation for line-of-duty injuries, and the other that authorizes the USMC in certain circumstances to require a reservist to execute a waiver of statutory sanctuary protections as a

condition of issuing active duty orders.  Each set of regulations is premised on its own statutory authority, and each is aimed at serving its own purpose.  The question here is how (or even whether) these authorities overlap in Plaintiff's case and, if so, what the interplay is between the two.  The parties' cross-motions tee up the issues to be answered in a two-part analysis: (1) whether Plaintiff consented to continuing on active duty orders, even though he refused to execute a sanctuary waiver, and (2) whether the USMC could lawfully condition extension of Plaintiff's orders on a sanctuary waiver.  The Court addresses the issues *ad seriatim*.

A.   The USMC Had No Obligation, Absent Plaintiff's Consent, to Continue Plaintiff on Active Duty for the Purpose of Medical Hold.

Plaintiff argues that his separation from active duty was contrary to law because, as of his separation date, none of the conditions of SECNAVINST 1770.3D had been met: no treating physician had found him "Fit for Duty," the PEB had not rendered a determination regarding whether he was "Fit for Continued Naval Service," and Plaintiff had not elected to be released from Medical Hold.  ECF No. 10 at 25 (citing generally SECNAVINST 1770.3D).  Defendant asserts that Plaintiff's separation from active duty was an unavoidable consequence of Plaintiff withholding his consent to the extension of his soon-to-expire orders.  ECF No. 11 at 15.  Because the USMC could not retain Plaintiff on active duty without his consent, Defendant contends the USMC violated no law or regulation by permitting Plaintiff's active duty orders to expire on their own terms.  *Id.* at 16.  According to Defendant, this, in turn, caused the USMC to terminate Plaintiff's Medical Hold because a reservist must be on active duty to maintain such status.  *Id.* at 15.

Consistent throughout the relevant statutory and regulatory provisions relating to the Medical Hold process is the requirement of consent.  Section 12301(h) authorizes the Secretary of a military department to order to and retain a reservist on active duty to receive medical treatment

or be medically evaluated for a disability, but *only* with the reservist's consent.[6] 10 U.S.C. §§ 12301(h)(1), (2). As discussed above, DoDI 1241.01 and DoDI 1332.18 mandate the retention of reservists, with their consent, on active duty for the purpose of completing medical treatment or the disability evaluation process. *See* DoDI 1241.01, ¶ 3; DoDI 1332.18, ¶ 3. SECNAVINST 1770.3D also explicitly requires reserve personnel, as part of the Medical Hold process, to "[c]onsent to remain or be placed on active duty for incapacitation treatment or [DES] adjudication." SECNAVINST 1770.3D, ¶ 8.b.(2). The consent requirement, therefore, is fundamental to the statutory and regulatory scheme.

Plaintiff characterizes the consent requirement as a unilateral benefit to reservists, precluding conscription and protecting the right of the reservist to timely resume his or her civilian life. ECF No. 10 at 31 ("The consent requirement was not designed to benefit the military nor intended as a mechanism to force a Reservist to agree to any conditions the military might desire to impose."). According to Plaintiff, the consent requirement may be used solely by reservists to secure benefits from the service branch and to control the manner in which a reservist enters and remains on active duty. *See* Pl.'s Resp. to Def.'s Cross-Mot. & Mot. to Dismiss at 21, ECF No. 12. Defendant, on the other hand, argues that the consent requirement mutually benefits the

---

[6] Plaintiff was ordered to active duty pursuant to 10 U.S.C. § 12301(d), which also requires the consent of the reservist as a condition of being ordered to or retained on active duty. *See* 10 U.S.C. § 12301(d) ("At any time, an authority designated by the Secretary concerned may order a member of a reserve component under his jurisdiction to active duty, or retain him on active duty, with the consent of that member."). Plaintiff remained on § 12301(d) orders while he was on Medical Hold due to "fiscal and manpower consideration[s]." ECF No. 15 at 8 n.1. The Court, here, cites § 12301(h) as the relevant statutory authority related to ordering reservists to, or retaining them on, active duty for purposes of medical treatment or disability evaluation. Neither party suggests that the use of § 12301(d), rather than § 12301(h), as authority for issuing and extending Plaintiff's orders bears any material legal significance or that the term "consent" should be interpreted differently between these sections.

reservist and the service branch, protecting the latter's discretion to establish the terms of initiating and extending active duty orders. *See* Def.'s Reply at 12, ECF No. 15.

In this case, Plaintiff contends that he satisfied the consent requirement of the applicable statutory and regulatory authorities, notwithstanding his refusal of the sanctuary waiver condition imposed by the USMC. *See* ECF No. 12 at 20. There can be no doubt that Plaintiff had a desire to remain on active duty for the purpose of Medical Hold. *See* AR 244–45, 249–50, 262, 263. The question, however, is whether the Court should treat Plaintiff's *desire* to remain on active duty to complete the DES process as equivalent to *consent* to be retained on active duty for that purpose or, alternatively, whether the Court should disregard the condition imposed by the USMC on its offer to extend Plaintiff's active duty orders when determining whether Plaintiff consented. In both instances, the Court finds it should not.

The Court first begins with the language of the statute and regulations at issue. *See United States v. Gonzales*, 520 U.S. 1, 4 (1997). The Court's "inquiry must cease" if such language is unambiguous and the statutory and regulatory scheme "is coherent and consistent." *Robinson* v. *Shell Oil Co.*, 519 U.S. 337, 340 (1997) (quoting *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 240 (1989)). "Consent" is defined as a "voluntary yielding to what another proposes or desires." Black's Law Dictionary 368 (10th ed. 2014). Indeed, at oral argument, Plaintiff's counsel defined the plain meaning of the term consent as "voluntary agreement." Hr'g Tr. at 10:1–2, ECF No. 22. Fundamental to a valid agreement is mutual assent, requiring acceptance of all essential terms of the offer. *Cf. Anderson v. United States*, 344 F.3d 1343, 1353 (Fed. Cir. 2003) (citing *Est. of Bogley v. United States*, 514 F.2d 1027, 1032 (Ct. Cl. 1975) ("It is fundamental that in order to have a valid contract . . . the offer must be accepted as to all its terms by the offeree.")). Therefore, for a reservist to consent to remain on active duty within the statutory and regulatory

meaning of the term, the reservist must accept or "voluntarily yield" to the terms of the service branch's offer of retention.  *See* Black's Law Dictionary 368.  Indeed, a review of Plaintiff's original orders to active duty, which laid out the terms of his orders and required Plaintiff to confirm his acceptance, supports this interpretation.  *See* AR 433 (requiring Plaintiff to "(Circle the appropriate response) "I voluntarily accept/do not accept these orders").

The statutory and regulatory scheme here is coherent and consistent.  At the statutory level, the Secretary of a military department has the discretion to order to or retain a reservist on active duty for medical care and disability evaluation.  *See* 10 U.S.C. § 12301(h).  At the regulatory level, this discretion is constrained by DoD and USMC policies that require retention if all conditions (including consent) are met.[7]  *See, e.g.*, DoDI 1241.01, ¶ 3 (requiring that an injured reservist "[w]ill, with his or her consent, be retained" on active duty); MARADMIN 259/04 (dictating that reservists "will be retained on active duty until they are fit for duty"); *see also Fisher*, 402 F.3d at 1177.  Therefore, the scheme requires that a service branch extend an offer to place or retain an eligible injured reservist on active duty for purposes of medical treatment and disability evaluation.  It is then the reservist's choice to accept the offer (*i.e.*, consent) or refuse the offer.  The regulatory scheme reflects that binary choice, where a failure to consent to the service branch's offer is characterized as either an election not to continue or a declination to continue on active duty.  *See*

---

[7]  Defendant argues in its brief that, regardless of the consent requirement, the USMC has no legal obligation to extend a reservist's active duty orders through the length of his Medical Hold because "[m]edical hold is at the discretion of the service."  ECF No. 11 at 20.  It relies primarily on discretionary language in the relevant statutory provisions and Navy-level regulations and ignores DoD-level and USMC-level regulations that limit that discretion through the use of mandatory language.  *Id.*  Even where Congress grants an agency discretionary authority, the agency may choose to limit its own discretion.  *See Fisher*, 402 F.3d at 1177 (holding that the military's procedural regulations "by their nature limit [its] discretion").  DoD has done just that with respect to medical hold authority, and Defendant conceded as much at argument.  Hr'g Tr. at 60:16–21.  The Navy instructions Defendant cites, to the extent they are conflicting, do not control.  *See, e.g.*, *Baude v. United States*, 955 F.3d 1290, 1299 (Fed. Cir. 2020).

DoDI 1241.01, ¶ 3 (stating a reservist "[m]ay elect to be released from active duty before resolution of the [medical] conditions or completion of the DES process"); DoDI 1332.18, ¶ 3 ("RC Service members may elect to be released from active duty before completion of DES processing."); MARADMIN 259/04, ¶ 5 ("Marines having incurred or aggravated a medical condition while activated may elect deactivation . . . ."); *see also* SECNAVINST 1770.3D, ¶ 8.h. (referencing reservists "who decline to accept or continue on active duty for incapacitation treatment").

Plaintiff is correct, then, that the consent requirement empowers reservists, permitting them to refuse unwanted or potentially unlawful or irregular orders. *See Groves v. United States*, 47 F.3d 1140, 1146 (Fed. Cir. 1995) (interpreting an Army regulation including the language, "will be returned to active duty with his or her consent," as "effectively put[ting] the onus on the Army to order [an officer] to active duty, while empowering [the officer] to reject unwanted, irregular, or unwarranted orders"). The consent requirement, however, does not aggrandize the reservist's power by permitting him or her to dictate the terms of the orders. That authority resides solely with the service branch as demonstrated by the plain meaning of consent—*i.e.*, the voluntary yielding to the proposed terms of the service branch and not the inverse.

Here, Plaintiff's belief that the USMC lacked authority to condition the extension of his active duty orders on his waiver of sanctuary does not have the effect of making the service branch's offer of retention unconditional. Nor was Plaintiff's sincere desire to remain on active duty to complete the DES process sufficient to satisfy the consent requirement, as contemplated by the statutory and regulatory scheme, even if he otherwise met the criteria to remain on active duty in a Medical Hold status. Because Plaintiff refused to waive his sanctuary protections, and therefore did not yield to the proposed terms of the USMC's offer to extend his orders, he did not consent (according to the plain meaning of that term) to remaining on active duty. Without

24

Plaintiff's consent, the USMC had no obligation to extend Plaintiff's active duty orders to facilitate his Medical Hold.

>  B.  <u>The USMC Could Not Lawfully Require Plaintiff to Waive Sanctuary.</u>

The Court's inquiry is not at an end, however.  Under *Carmichael*, a service member who is separated from a service branch due to the member's failure to consent to unlawfully imposed conditions or terms may seek recovery pursuant to the Military Pay Act.  *See Carmichael*, 298 F.3d at 1372.  The Court must therefore determine whether the USMC could lawfully condition the extension of Plaintiff's active duty orders on his waiver of sanctuary protections.  For the reasons explained below, the Court finds that Plaintiff's orders were not subject to the Secretary's waiver authority.

>  1.  Application of Sanctuary Waiver to Reservists on Medical Hold

As an initial matter, Plaintiff does not point to any language in § 12686(b) indicating that the Secretary's waiver authority does not apply to active duty orders of reservists who are in a Medical Hold status.  Indeed, the sanctuary waiver provision is broadly worded to apply to reservists who, among other criteria, are "to be ordered to active duty (other than for training) under section 12301."  10 U.S.C. § 12686(b).  The sanctuary provision similarly applies to reservists "on active duty (other than for training)."  *Id.* § 12686(a).  Thus, the only orders excepted from the Secretary's waiver authority (and from triggering sanctuary to begin with) are training orders.  *See id.* §§ 12686(a), (b); *see also* SECNAVINST 1800.2, ¶ 3.b. ("All active duty orders including Active Duty for Training (ADT) [and] Annual Training (AT) . . . , are included in the calculation of a 20-year Active Duty Retirement.  However, ADT and AT orders do not trigger the sanctuary provision.").  An active duty order for the purpose of medical treatment or disability evaluation, which is specifically authorized under § 12301(h), thus explicitly falls within the

category of orders subject to § 12686(b).  Accordingly, although Plaintiff may find the application of the waiver requirement to active duty orders for the purpose of Medical Hold "morally repugnant," ECF No. 10 at 30, it is not contrary to the plain language of the statute.

>    2.    Application of the Sanctuary Waiver Requirement to Plaintiff's Orders

The question then becomes whether the USMC could lawfully apply the waiver requirement to Plaintiff's active duty orders.  Plaintiff contends that the USMC acted contrary to law by conditioning the further extension of his orders on a waiver of sanctuary.  ECF No. 12 at 22.  He argues that because his original orders specified a period of 183 days and had been modified five times to extend the period of active duty to 538 days, to coincide with his Medical Hold, the USMC lacked authority under § 12686(b) to require him to waive sanctuary for further extension of his orders.  *Id.* at 22–23; ECF No. 10 at 23.  The USMC did not require Plaintiff to waive sanctuary before his original orders commenced or before he was placed on Medical Hold and, according to Plaintiff, could not compel waiver thereafter.  *See* ECF No. 12 at 23.

Defendant agrees that the USMC could not require Plaintiff to waive sanctuary with respect to his initial 183-day period of active duty.  *See* ECF No. 11 at 19–20 ("The fact that no waiver had been requested during [Plaintiff's] 183-day active duty extension was in accordance with the regulations. . . .").  It, however, argues that MCO 1001.61A permits the USMC to require waivers for the extension of a reservist's active duty orders to facilitate an existing Medical Hold.  *Id.* at 17; ECF No. 15 at 15–16.  MCO 1001.61A provides:

>    If the situation arises where a reserve Marine's initial placement or subsequent extension on medical hold will cause the member to exceed 18 years of total active duty service, the DC M&RA can withhold the issuance of ADOS orders if the reservist fails to execute a waiver of sanctuary eligibility as part of their consent to be continued on active duty for medical observation, evaluation or treatment.

MCO 1001.61A, ch. 3, ¶ 7.  In Defendant's view, that is precisely what the USMC did in Plaintiff's case.  Focusing on the extension period as an independent active duty period, it contends that imposing a waiver requirement was lawful because the extension of Plaintiff's orders beyond March 21, 2017, would have been for a period of less than 180 days during which Plaintiff otherwise would have attained sanctuary.  ECF No. 11 at 19; ECF No. 15 at 15.  Defendant's argument fails for multiple reasons.

   *a. The Waiver Requirement Was Inapplicable to Plaintiff's Orders on Their Face.*

   First, the terms of Plaintiff's original orders and subsequent modifications extending those orders undermine Defendant's argument.  Plaintiff was ordered to active duty under § 12301(d) in September 2015 on orders specifying a 183-day active duty period.  AR 428.  As noted above, given their length, the parties agree that the USMC had no authority to require Plaintiff to waive sanctuary as a condition of his original orders.  And, in fact, Plaintiff was not requested to and did not execute any sanctuary waiver.  *See id.* at 6.  Consistent with that position, the USMC required Plaintiff, as part of his acceptance of the original orders, to certify his understanding that he "may become eligible for sanctuary zone protection" under § 12686(a).  *Id.* at 433.  Plaintiff's orders were originally set to expire on March 31, 2016, nearly a year before Plaintiff would have become eligible for sanctuary zone protection.  *See id.* at 428.  Because Plaintiff would not become eligible for sanctuary during the period covered by his original orders, the only means by which Plaintiff could enter sanctuary would be through an extension of his orders' original expiration date.

   Moreover, the language of each modification order cuts against Defendant's contention that the Court should treat the extension of Plaintiff's orders as a distinct period of active duty in terms of applying § 12686(b).  Plaintiff's first modified order, and every subsequent modified order, specified a period of active duty beginning with the date Plaintiff was brought on duty,

October 1, 2015, and ending with a date that increased the duration of Plaintiff's active duty service measured by days.  *See id.* at 435 (reflecting 337 total days on active duty), *id.* at 438 (reflecting 357 total days on active duty), *id.* at 441 (reflecting 490 total days on active duty), *id.* at 444 (reflecting 517 total days on active duty), at 447 (reflecting 538 total days on active duty).  According to the text of the orders, each extension was an addition to Plaintiff's original period of active duty.  The modifications did not reflect separate, distinct active duty periods, as Defendant posits.  As a result, with each extension, Plaintiff's total active duty period increased, becoming further attenuated from the 179-day temporal limitation Congress imposed on the Secretary's waiver authority.

Finally, each modified order did not stand alone, rather it incorporated the terms of Plaintiff's original orders.  Specifically, each modification stated that it became part of Plaintiff's original orders and "[a]ll other provisions of the original orders remain[ed] the same." *Id.* at 437, 439, 442, 446, 448.  This would include Plaintiff's certification that he may become eligible for sanctuary during the period of active duty covered by the orders.  Because the modified orders became intractably linked to Plaintiff's original orders, they did not qualify on their face as orders that "specif[y] an active duty period of 180 days or less." 10 U.S.C. § 12686(b).

The record indicates that the USMC was planning to continue Plaintiff on active duty, if he submitted a sanctuary waiver, through a similar extension of orders.  *See* AR 243, 248, 254, 264–65 (emails discussing extended orders).  Accordingly, under the applicable statute and regulations, Plaintiff's active duty orders did not meet the criteria necessary for the USMC to invoke its authority to condition the extension of such orders on a sanctuary waiver.  *See* 10 U.S.C. § 12868(b); *see also* MCO 1800.11, ch. 1, ¶ 12.a.; MARADMIN 104/13, ¶ 4.C.

b.  *Defendant's Interpretation of Its Waiver Authority Contravenes the Plain Language of the Statute.*

Assuming the language of Plaintiff's orders is not dispositive, the Court must determine the propriety of the USMC's interpretation of § 12686(b)'s waiver authority as it applies to extensions of active duty orders for reservists on Medical Hold.  *See* MCO 1001.61A, ch. 3, ¶ 7. The Court acknowledges the "substantial deference" owed to the military in the governance of its own affairs.  *Antonellis*, 723 F.3d at 1332 (quoting *Dodson v. United States*, 988 F.2d 1199, 1204 (Fed. Cir. 1993)); *see Voge*, 844 F.2d at 779.  This deference compounds with the deference the Court generally owes to an agency's interpretation of its own regulations and its construction of a statute Congress charged it with administering.[8]  *See Wronke*, 787 F.2d at 1576 (citing *United States v. Clark*, 454 U.S. 555, 565 (1982)); *Favreau v. United States*, 317 F.3d 1346, 1358–59 (Fed. Cir. 2002) (citing *Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1084), and *United States v. Mead Corp.*, 533 U.S. 218 (2001)).  As substantial as it may be, however, the deference owed is not without limits.  Even where an agency is authorized by Congress to promulgate rules or regulations, "no such rule or regulation can confer on the agency any greater authority than that conferred under the governing statute." *Killip v. Off. of Pers. Mgmt.*, 991 F.2d

---

[8]  Neither party's motion addresses the question of whether—and, if so, what measure of—deference is owed to the USMC's interpretation of the waiver authority provided in § 12686(b) as applied to reservists in a Medical Hold status.  The court in *Brookins v. United States* analyzed sanctuary waiver policies set forth in a different Marine Corps order under the analysis discussed in *Mead*, which applies where *Chevron* is inapplicable and affords "some" deference to an agency's interpretation of a statute based on "the degree of the agency's care, consistency, formality, and relative expertness, and . . . the persuasiveness of the agency's position." 75 Fed. Cl. 133, 149 (2007) (quoting *Killeen v. Off. of Pers. Mgmt.*, 382 F.3d 1316, 1321 (Fed. Cir. 2004) (citations omitted and text omission in original)).  *Brookins* involved distinguishable factual circumstances and a different legal question—*i.e.*, whether a reservist could *voluntarily* choose to waive sanctuary, not the limits of the Secretary's authority to *require* a sanctuary waiver.  *See id.* at 142.  Regardless, the Court finds that § 12686 "provides a clear answer," *id.* at 141, and thus an analysis of whether and what deference is owed to the USMC's contrary interpretation is not necessary.

1564, 1569 (Fed. Cir. 1993) ("Any and all authority pursuant to which an agency may act ultimately must be grounded in an express grant from Congress.").

The Court therefore begins, again, with the language of the statute. *See Gonzales*, 520 U.S. at 4.  Section 12686 consists of two parts: subsection (a) protects reservists who have attained 18 years of active duty service from being involuntarily released from active duty before they become eligible for retired pay, while subsection (b) authorizes the Secretary to require reservists, who would otherwise qualify for sanctuary, to waive the protection of subsection (a) for certain active duty orders that do not exceed 179 days. *See* 10 U.S.C. §§ 12686(a), (b).  The Secretary's waiver authority under § 12686(b) is plainly limited only to reservists who meet three criteria.  The reservist must be one who (1) is "to be ordered to active duty (other than for training) under section 12301," (2) "pursuant to an order that specifies a period of less than 180 days," and (3) would be covered by § 12686(a) but for the waiver. *Id.* § 12686(b).  Section 12686(b) also contemplates when the Secretary (or his duly authorized designee) may exercise his waiver authority.  It specifically allows a waiver as a "condition" of the active duty orders at issue to be executed "before the [reservist's] period of active duty begins." *Id.* (providing that the Secretary concerned "may" require that a waiver be executed before the active duty period).  The statute does not expressly state whether a waiver can be executed after the reservist has commenced the active duty period but the use of permissive language suggests the Secretary has commensurate authority once a reservist has begun serving on active duty under the orders subject to the waiver.

As relevant here, the statutory text compels two conclusions that support Plaintiff's argument.  First, contrary to MCO 1001.61A, the language of § 12686(b) does not by its terms allow the Secretary to condition the extension of Plaintiff's active duty orders for the purpose of Medical Hold on execution of a waiver.  The waiver provision may be applied only to a reservist

who is "to be ordered to active duty (other than for training)."  10 U.S.C. § 12686(b).  The use of

the verb "to be" in this phrase "conveys a sense of planning for the future."  *Est. of Rubenstein v.*

*United States*, 96 Fed. Cl. 640, 652 (2011) (citing *Nat'l Data Corp. & Subsidiaries*, 50 Fed. Cl.

24, 30 n.12 (2001)).  When combined with the infinitive "ordered" it describes a circumstance

where an active duty order will be issued to the reservist in the future but at the time is merely

anticipated.  Congress has indicated through the use of similar language in different sections of

Title 10 that the phrase "ordered to active duty" refers to an order placing a reservist on active

duty, as distinguished from an order retaining a reservist on active duty.  Section 12301, to which

§ 12686's waiver provision explicitly refers, is one such example.  Section 12301(d) authorizes

the Secretary to "*order* a member of a reserve component under his jurisdiction *to active duty, or*

*retain him on active duty*, with the consent of that member."  10 U.S.C. § 12301(d) (emphasis

added).  Section 12301(h) also allows for a "member *ordered to active duty*[,] . . . with the

member's consent, [to] be *retained on active duty*, if the Secretary concerned considers it

appropriate" for medical treatment or evaluation.  10 U.S.C. § 12301(h)(2) (emphasis added).

Other sections of the same title include this distinction between the same or similar language.  *See*

10 U.S.C. § 12322 (permitting a uniformed service member who is injured in the line of duty while

performing inactive-duty training to "be ordered to active duty," and a member who is injured in

the line of duty while performing active duty to "be continued on active duty," to receive medical

treatment); *compare id.* § 12323(a) (permitting the Secretary concerned to "retain[] on active

duty," until completion of a line of duty determination, reservists who are alleged victims of sexual

assault committed while on active duty where the reservist is still serving on active duty,) *with id.*

§ 12323(b) (permitting the Secretary concerned to "order . . . to active duty," for the same purpose,

reservists who are alleged victims of a sexual assault committed while on active duty where the reservist is no longer on active duty).

Congress's use of similar "ordered to active duty" language in other parts of the statute, when juxtaposed with language explicitly addressing retention or continuation on active duty, is significant. Even more significant is Congress's choice *not* to include retention language in the sanctuary waiver provision, even though it separately referred to active duty orders retaining reservists in other related sections. The Court cannot ignore the deliberate choices made by Congress when it drafted the waiver provision. *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.").

At oral argument, Defendant emphasized that the language of § 12686(b) gives the Secretary discretion to require a waiver either before an active period begins or during the period of active duty, as was the case here. Hr'g Tr. 49:17–50:7; *see* ECF No. 15 at 14, 15. Although the Court agrees that the statute gives discretion to the Secretary to require execution of a sanctuary waiver before the period of active duty covered by the waiver or—by implication—during that same period, that implied authority does not logically extend to the execution of a waiver to cover future, extended periods. *See* 10 U.S.C. § 12686(b). Nor has Defendant cited any cases or other authority supporting that interpretation. Moreover, USMC policy requires that, when sanctuary is to be waived, the waiver is signed prior to executing the active duty orders. *See* MCO 1800.11, ch. 1, ¶ 12.b. Under a plain reading of § 12686(b), the Court, therefore, agrees with Plaintiff that the USMC could not require a sanctuary waiver as a condition to extend Plaintiff's active duty orders to continue him on Medical Hold (a status he was placed in nearly a year prior to his

separation) where Plaintiff was already serving on active duty with no waiver of sanctuary for approximately 18 months.[9]

Second, even assuming the statutory text were ambiguous, the USMC's interpretation is unreasonable because it would render the waiver provision's temporal limitation superfluous. Section 12686(b) explicitly limits the Secretary's waiver authority to an order to active duty that specifies a period of less than 180 days. 10 U.S.C. § 12686(b). Defendant nonetheless argues that it can separately require a waiver for any extension of an active duty order for a period of less than 180 days, irrespective of the number of days specified in the original orders or the duration of the reservist's total active duty period. *See* ECF No. 11 at 19; ECF No. 15 at 15. This position is unreasonable considering the sanctuary waiver provision expressly contemplates only a short-term "order[] to active duty." *See* 10 U.S.C. § 12686(b). The statute's temporal restriction is effectively meaningless if each and every extension is treated as an isolated active duty period. *See Duncan v. Walker*, 533 U.S. 167, 174 (2001) ("It is [a court's] duty to give effect, if possible, to every clause and word of a statute." (quoting *United States v. Menasche*, 348 U.S. 528, 538–39 (1955))); *Sharp v. United States*, 580 F.3d 1234, 1238 (Fed. Cir. 2009) (rejecting the Government's statutory interpretation because courts "should avoid rendering any of the statutory text meaningless or as mere surplusage").

The effect of the USMC's interpretation would both undermine the sanctuary protection that Congress intended to confer on reservists with lengthy active duty service time and expand the flexibility Congress afforded the Secretary "to bring [reservists] on active duty for up to 179

---

[9]   Defendant argues Plaintiff conceded that "the Corps can set shorter active duty assignments, even serially, each of which will require a sanctuary waiver." ECF No. 11 at 19. In fact, Plaintiff asserted only that "the USMC could have issued [his original] orders for 179 days or less and required a sanctuary waiver as a condition of issuing the orders." ECF No. 10 at 23. The Court does not believe this statement supports Defendant's broad concession claim.

days even if those members are in, or would enter, sanctuary . . . during the contemplated period of service." *Brookins v. United States*, 75 Fed. Cl. 133, 144 (2007) (quoting Marine Corps Reserve Administrative Management Manual, MCO P1001R.1J, ¶ 3109 (1999)).   Where Congress has struck a balance between policy considerations, the Court is bound to uphold the lines it draws.[10] *See Am. Tobacco Co. v. Patterson*, 456 U.S. 63, 77 (1982) (where Congress strikes a balance between two policies "it is not th[e] Court's function to upset that balance"); *see also Absher v. United States*, 805 F.2d 1025, 1027 (Fed. Cir. 1986).

The USMC's interpretation also fails to find support in the JAD Memo, which is the sole legal authority cited by the relevant provision of MCO 1001.61A.  The JAD Memo provided a legal opinion to MMIB-2 about "whether the Marine Corps can require reserve Service members, approaching 18 years of active duty service, to execute a sanctuary waiver before being placed in a medical hold status."  AR 217.  The two-page memo concluded that there is "no legal objection" to such requirement, and "it would not be unreasonable or legally objectionable for the Marine Corps to withhold orders under section 12301(d) if the reservist fails to execute a waiver of

---

[10] The legislative history reflects the policy considerations faced by Congress.  In 1956, Congress created sanctuary protection "to provide some degree of economic security as an inducement to reservists to stay on active duty, thus reducing unwanted attrition and its attendant costs to the Government." *Wilson v. United States*, 917 F.2d 529, 532 (Fed. Cir. 1990).  Through the waiver authority, codified approximately four decades later, Congress sought to "permit a reservist who, by virtue of his or her years of service, may qualify for the retirement sanctuary to serve on active duty for a period of less than 180 days, if he or she waives the retirement sanctuary." *Brookins*, 75 Fed. Cl. at 143 (quoting National Defense Authorization Act for Fiscal Year 1997, S. Rep. No. 104-267, § 514 (May 13, 1996)).  The sanctuary and waiver provisions therefore can be understood as mutually beneficial, advancing the interests of both reservists and service branches.  Navy regulations similarly reflect a balance of interests. *See* OPNAVINST 1001.27, ¶ 5.c. (describing the balance between the Navy's need to utilize reservists with unique skill sets and to fill short-term Navy requirements with the fiscal costs incurred by the Navy when reservists become eligible for regular retirement pay).  Codified as part of this enterprise is the temporal limitation on the Secretary's authority to require waiver for active duty orders specifying a period of less than 180 days. *See* 10 U.S.C. § 12686(b).

sanctuary as part of his/her consent to being continued on active duty for medical observation, evaluation, or treatment." *Id.* (listing as references 10 U.S.C. §§ 12301, 12686; OPNAVINST 1001.27 (denoted as a "draft"); and MCO 1800.11).

As explained above, the Court does not disagree that, based on the plain language of § 12686(b), the USMC could require a reservist to execute a sanctuary waiver as a condition of active duty orders for the purpose of Medical Hold but *only if* those orders fall within the limits of the Secretary's waiver authority—*i.e.*, they order a reservist to active duty, for a specified period of less than 180 days, during which the reservist would otherwise obtain sanctuary. 10 U.S.C. § 12686(b). The JAD Memo does not discuss—or even refer to—these limiting criteria; instead, it describes the sanctuary waiver provision in broad terms that go well beyond the plain language of the statute. AR 217 (noting that § 12686(b) "provides that the Secretary concerned may require, as a condition of an order to active duty under [§ 12301], that the member waive the applicability of [§ 12686(a)]"). To the extent the legal opinion purports to exceed the scope of § 12686(b), it— as well as the relevant provision of MCO 1001.61A—would be contrary to law, as explained above.

Likewise lacking is the JAD Memo's analysis of Navy and USMC policies that purport to prohibit issuing active duty orders to sanctuary-eligible reservists on Medical Hold absent a sanctuary waiver. Although recognizing that the Navy does not have a policy that expressly addresses these circumstances, the memo relies on a draft of OPNAVINST 1001.27, which states "the Navy's intent [not] to have members attain a regular retirement from orders written per 10 U.S.C. § 12301(h)." *Id.* at 218. The final version of this instruction directs Navy Personnel Command to "ensure that other methods to comply with legal obligations to Sailors are utilized *prior* to issuing [§ 12301(h)] orders" to such Sailors. OPNAVINST 1001.27, ¶ 8.g. (emphasis

35

added).   It says nothing about the Secretary's authority to require a sanctuary waiver from reservists on Medical Hold, nor does it prohibit Navy Personnel Command from issuing orders to such reservists absent execution of a waiver.   *See generally* OPNAVINST 1001.27.   The JAD Memo also refers to a provision of MCO 1800.11 that states the USMC has no legal obligation to issue or extend active duty orders that may result in a reservist attaining sanctuary.   AR 218.   As Plaintiff notes, however, the memo does not reference—or even mention—the controlling DoD and USMC policies that obligate the retention of certain reservists, with their consent, on active duty for the purpose of completing the DES process.   ECF No. 12 at 22.   Nor does it attempt to analyze the application of that policy to a situation, such as the one presented by Plaintiff's case, where the statute does not authorize the Secretary to condition a reservist's consent to orders on a waiver of sanctuary.

In any event, as Plaintiff emphasizes, the JAD Memo ultimately concludes that requiring a waiver "*prior to* executing 12301(d) orders for medical observation, evaluation, or treatment" would not be objectionable.   ECF No. 12 at 22 (citing AR 218).   Notably, however, MCO 1001.61A is not similarly limited.   Rather, it expands upon the scope of the memo by requiring a sanctuary waiver as a condition of a reservist's "consent to be continued on active duty" either for "initial placement [in] *or subseqeuent extension*" of Medical Hold.   MCO 1001.61A, ch. 3, ¶ 7 (emphasis added).   Here, of course, the USMC did not require (or even request) that Plaintiff execute a waiver prior to issuance of his original active duty orders or prior to him being placed on Medical Hold.   *See* ECF No. 10 at 9, 11–12.

Accordingly, the USMC could not lawfully require Plaintiff to waive sanctuary as a condition of extending his active duty orders to facilitate his Medical Hold.   Because Plaintiff's original orders specified an active duty period of 183 days, and subsequent extensions that became

part of those original orders only lengthened his time on active duty, the Secretary's statutory sanctuary waiver authority did not apply to further extension of Plaintiff's orders. The USMC's interpretation to the contrary, including in MCO 1001.61A, is inconsistent with the plain language of § 12686(b).

C.   The USMC's Unlawful Use of Sanctuary Waiver Authority Directly Caused Plaintiff's Separation.

The record establishes that Plaintiff would have obtained sanctuary status but for the USMC unlawfully conditioning further extension of his active duty orders on the requirement that he execute a sanctuary waiver. Plaintiff was on track to complete 18 years of active duty service on March 25, 2017, four days before his modified active duty orders expired. AR 266. As evident from the exchanges of emails between Plaintiff and various USMC officials, Plaintiff wanted to remain on active duty for Medical Hold until the conclusion of the disability evaluation process. *See id.* at 244–45, 249–50, 262, 263. The only reason he did not consent to further extension of his orders to facilitate that process was because he respectfully disagreed that the USMC could condition his orders on execution of a sanctuary waiver. *See, e.g., id.* at 250; *see also Carmichael*, 298 F.3d at 1372. The parties have not identified any other term of the proposed extension of his orders that was in dispute. The USMC presented no alternative option to keep Plaintiff on active duty short of signing a sanctuary waiver. *See, e.g.,* AR 239, 254, 266; *see also Carmichael*, 298 F.3d at 1372. And, as explained above, the USMC lacked authority to condition Plaintiff's orders in such a manner. *Carmichael*, 298 F.3d at 1372.

Absent that condition, the Court finds that Plaintiff would have consented to his extended orders (within the meaning of that term) and, pursuant to both DoD and USMC policy, would have been entitled to remain on active duty until the completion of his disability evaluation. *See* DoDI 1241.01, ¶ 3.a.(2); DoDI 1332.18, ¶ 3.h.; MARADMIN 259/04, ¶ 3.D. That evaluation process

concluded once Plaintiff accepted the PEB's decision finding him "Fit for Continued Naval Service," and the PEB notified the Commandant of the USMC of its final decision. *Id.* at 450, 451, 453, 456. The Court therefore finds that, had the USMC properly extended his orders, Plaintiff would have remained on active duty beyond March 25, 2017, at which point he would have reached sanctuary and could not have been involuntarily released without the Secretary's approval. Under an objective standard, Plaintiff has met his burden of demonstrating that he was involuntarily separated as a direct result of Defendant's unlawful action. *See Roskos*, 549 F.2d at 1389–90; *Carmichael* 298 F.3d at 1372.

*    *    *

The Court is cognizant that the USMC is tasked with the important responsibility of effectively managing Reserve manpower both to ensure it can meet mission requirements and to avoid the unintended impacts, including the expense, of reservists earning regular retirement. *See* ECF No. 11 at 18–19; *see also, e.g.*, OPNAVINST 1001.27, ¶ 5. Consistent with that duty, Navy and USMC policies seek to ensure that reservists "who meet or exceed 18 years of active duty do so by design and are planned, budgeted additions to the Total Force." SECNAVINST 1800.2, ¶ 3; *see* OPNAVINST 1001.27, ¶ 5; MCO 1800.11, ¶ 3. Although Defendant may consider the Court's judgment here to confer "a windfall conversion to active duty retirement that would be entirely extraneous" to the purpose of active duty orders for Medical Hold, ECF No. 15 at 9, Congress has determined that such orders may lead to a reservist attaining sanctuary and has provided limited authority to the Secretary concerned to condition such orders on a sanctuary waiver. The role of this Court is to ensure the USMC complied with applicable law and established procedures, "as it is written—even if . . . some other approach might accord with good policy."

38

*Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 231 (2014) (quoting *Burrage v. United States*, 571 U.S. 204, 218 (2014)); *see Tippens v. United States*, 154 Fed. Cl. 373, 383 (2021).

Of course, even the most carefully planned and artfully drafted policies cannot conceive of all the possible cases in which a reservist may become eligible for sanctuary. That does not mean the USMC was without authority or an available method to rectify Plaintiff's situation. Sanctuary is, after all, not absolute. It protects reservists with at least 18 years of active duty service from involuntary release "*unless* the release is approved by the Secretary." 10 U.S.C. § 12686(b) (emphasis added). The USMC would have been free to seek authorization from the Secretary to involuntarily release Plaintiff once he received his final PEB determination.

In sum, although this Court does not aim to intrude on the USMC's personnel decisions, the fact remains that, in seeking to comply with service regulations, it exceeded its statutory waiver authority in Plaintiff's case and thus its action was contrary to law.

## CONCLUSION

For the above stated reasons, Plaintiff's Motion for Judgment on the Administrative Record (ECF No. 10) is hereby **GRANTED**, and Defendant's combined Motion to Dismiss and Cross-Motion for Judgment on the Administrative Record (ECF No. 11) is **DENIED**. On or before November 8, 2021, the parties shall file a joint status report proposing appropriate next steps consistent with this Opinion, including remedies, and a schedule for post-judgment proceedings should they be necessary.

**SO ORDERED**.

Dated: November 1, 2021                      */s/ Kathryn C. Davis*
                                             KATHRYN C. DAVIS
                                             Judge