## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ———————————————— | ) | |
| PETER C. FAERBER, | ) | |
| | ) | |
| Plaintiff, | ) | No. 20-509C |
| | ) | |
| v. | ) | Filed: January 24, 2024 |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| ———————————————— | ) | |

## <u>OPINION AND ORDER</u>

Plaintiff Peter C. Faerber is a retired Lieutenant Colonel in the United States Marine Corps ("USMC"). He was released from active duty on March 21, 2017, and filed suit in this Court on April 27, 2020. The Court has already determined that Plaintiff's release was unlawful and that, but for the error, he would have remained on active duty into the sanctuary zone provided for in 10 U.S.C. § 12686(a). The Court then remanded the matter to the Board for Correction of Naval Records ("BCNR" or "Board") to determine how long Plaintiff would have remained on active duty had he not been unlawfully released and to grant relief accordingly. Plaintiff now challenges the BCNR's decision on the basis that it (a) arbitrarily and unlawfully concluded that the Secretary of the Navy ("Secretary") would have involuntarily released Plaintiff on April 17, 2017, and (b) erroneously denied him further relief.

For the reasons articulated below, the Court **GRANTS IN PART** and **DENIES IN PART** Plaintiff's Motion for Judgment on the Administrative Record and **GRANTS IN PART** and **DENIES IN PART** Defendant's Cross-Motion for Judgment on the Administrative Record.

# I.  BACKGROUND

This opinion addresses the relief that Plaintiff is due because of his unlawful release, and it assumes the reader's familiarity with the Court's prior merits decision.  *See Faerber v. United States*, 156 Fed. Cl. 715 (2021).  Since both the Court and the parties agreed that the appropriate relief in this matter was dependent on "further discretionary, agency-level determinations" consistent with the Court's ruling, the Court ordered the BCNR to address certain questions in the first instance.  Order at 1, ECF No. 28.  Specifically, the Court tasked the BCNR with determining and explaining: (a) how long Plaintiff would have remained on active duty after March 25, 2017, had the USMC not unlawfully conditioned the extension of Plaintiff's orders on his execution of a sanctuary waiver; (b) what changes to Plaintiff's record are warranted based on its conclusions; and (c) whether Plaintiff is entitled to further relief.  *Id.* at 2–3.  The Court also instructed the BCNR to consider any other issues Plaintiff raised.  *Id.* at 3.

On July 13, 2022, the BCNR issued its decision.  Admin R. ("AR") 662–75, ECF No. 45.[1] The BCNR determined that the Secretary would have involuntarily released Plaintiff on April 17, 2017.  AR 673–74.  Indeed, it "ha[d] no doubt that the Secretary would have (and should have) exercised his authority to release [Plaintiff] from active duty if he had mistakenly been permitted to enter sanctuary status without a waiver."  AR 673.  The BCNR reached its conclusion based on evidence in the record demonstrating that the USMC did not intend for Plaintiff to reach sanctuary due to his Medical Hold status, as well as Navy and USMC policies that are designed to ensure reservists do not unexpectedly obtain sanctuary protection.  *Id.*  The Board emphasized that these policies are essential to the Navy's and USMC's ability to budget for and manage personnel.  *Id.*

---

[1] For ease of reference, citations to the Administrative Record refer to the bates-labeled page numbers rather than the ECF page numbers.

Though the BCNR registered its disagreement with the Court's decision, in deference to the Court's judgment, it concluded that Plaintiff would have remained on active duty through the completion of his disability evaluation process.[2]  AR 673–74 (citing Reserve Component (RC) Line of Duty Determination for Medical and Dental Treatments and Incapacitation Pay Entitlements, Department of Defense Instruction ("DoDI") 1241.01, ¶ 3 (2016) (providing that certain reservists "[w]ill, with his or her consent, be retained on [active duty] . . . until . . . he or she is either found fit for duty, separated, or retired as a result of a DES [Disability Evaluation System] finding.")).  Accordingly, the BCNR concluded that Plaintiff would have been retained on active duty until he was notified on April 17, 2017, of the Physical Evaluation Board's ("PEB") determination that he was fit for continued naval service.  *Id.* (citing DoDI 1241.01, ¶ 3).

Accordingly, the BCNR recommended that Plaintiff receive a corrected DD Form 215 reflecting his release from active duty on April 17, 2017, and that Plaintiff's records be updated to reflect the additional period of active duty service.  AR 675.  It also recommended that the Defense Finance and Accounting Service ("DFAS") audit Plaintiff's financial records in light of the changes to his service record and "make any appropriate payments that may arise from these changes."  *Id.*  On August 3, 2022, the Acting Assistant Secretary of the Navy for Manpower and Reserve Affairs ("ASN M&RA") approved the BCNR's findings and recommendations.  AR 676.

---

[2] As an aside, the Court notes that the basis for the BCNR's disagreement—that the USMC would have issued a back-to-back order, instead of an order extending Plaintiff's original set— was not an argument raised by the Government in this case.  *See* Def.'s Cross-Mot. for J. on Admin. R. at 18, ECF No. 11 (arguing that "[t]he Marine Corps was correct to condition *additional extensions* of active duty orders to LtCol Faerber upon his waiver of sanctuary zone protection" (emphasis added)); *id.* at 19–20; *see also* Tr. at 61:1–20, ECF No. 22 (failing to raise back-to-back order when asked whether an extension of an active duty period is effected by a modification of the original active duty order or a separate, distinct order).  In any event, the Court has since held that the Secretary's sanctuary waiver authority also does not apply to back-to-back orders that take a reservist beyond 179 days of continuous active duty service, which would have been the case here.  *See Marshall v. United States*, 164 Fed. Cl. 580, 597 (2023).

Shortly thereafter, Plaintiff filed a notice in this Court indicating that the BCNR had failed to consider all his submissions, namely a nine-page memorandum advancing several legal arguments in support of his petition.  Pl.'s Notice at 7–8, ECF No. 36; *see* AR 651–59.  The memorandum argued that Plaintiff was never lawfully discharged and that the BCNR "must implement the post-sanctuary provisions in MCO [Marine Corps Order] 1800.11A," allowing Plaintiff to continue on active duty orders or, if no validated requirement exists, accept an active duty retirement.  AR 655; *see* AR 651, 655–56.  It further argued that Plaintiff was entitled to constructive service credit from the time of his unlawful discharge to "the date on which the USMC complies with" those post-sanctuary procedures.  AR 651; *see* AR 654–55.  Finally, the memorandum argued that the Secretary could not use § 12686(a) to involuntarily release him because Plaintiff had never been lawfully removed from active duty and had constructively served for more than 20 years; thus, the sanctuary period created by § 12686(a) had already ended.  AR 656.  Plaintiff requested back pay and allowances, sought reimbursement for medical expenses, and asked the BCNR to convene a Special Selection Board ("SSB") to assess whether he should be promoted to O-6.  AR 657–59.

Due to the BCNR's failure to consider this memorandum, the Court once again remanded the matter to the BCNR for consideration.  *See* Order, ECF No. 39.  The BCNR reaffirmed its prior decision and rejected Plaintiff's arguments.  *See* AR 630–38.  It concluded that, because Plaintiff would have been involuntarily released on April 17, 2017, there was no need to implement post-sanctuary procedures, and Plaintiff was not entitled to constructive service credit past that date.  AR 634–35.  Further, because Plaintiff would have been involuntarily released prior to the date he would be considered for promotion to O-6, and because there was no evidence that he had been unfairly denied promotion to colonel, it found that the applicable statutes and regulations

governing promotion did not provide a basis for the BCNR to convene an SSB.  AR 635–36 (citing 10 U.S.C. § 14502; Special Selection Boards, Supplemental All-Fully-Qualified-Officers Lists, and Special Boards, Secretary of the Navy Instruction ("SECNAVINST") 1402.1 (2019)).  On December 2, 2022, the ASN M&RA again approved the BCNR's findings and recommendations. AR 638.

Plaintiff filed a supplemental complaint in this Court on February 10, 2023.  *See* Pl.'s Suppl. Compl., ECF No. 44.  He seeks reversal of his retroactive release, restoration to active duty, an order declaring that he reached 20 years of active duty service, and retroactive pay and allowances.  *Id.* ¶ 91(a)–(d).  Both parties then filed motions for judgment on the administrative record.  In sum, Plaintiff's motion contends that the BCNR's decision violated the constructive service doctrine, contravened applicable regulations, and was arbitrary and capricious.  *See generally* Pl.'s Mot. for J. on Admin. R., ECF No. 46; Pl.'s Opp'n & Reply, ECF No. 48. Defendant's motion asks that the Court uphold the BCNR's decision, which it contends was rationally explained, supported by the record, and consistent with law.  *See generally* Def.'s Mot. for J. on Admin. R., ECF No. 47; Def.'s Reply, ECF No. 50.  The Court held oral argument on October 19, 2023.

## II.  LEGAL STANDARDS

Motions for judgment on the administrative record are governed by Rule 52.1(c) of the Rules of the United States Court of Federal Claims ("RCFC").  The rule effectively "provide[s] for an expedited trial on the record."  *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005).  Unlike proceedings for summary judgment, "genuine issues of material fact will not foreclose judgment on the administrative record."  *XPO Logistics Worldwide Gov't Servs., LLC v.*

*United States*, 134 Fed. Cl. 783, 798 (2017) (citing *Bannum*, 404 F.3d at 1356), *aff'd*, 713 F. App'x 1008 (Fed. Cir. 2018).

Just as it did in the merits decision, the Court applies the arbitrary and capricious standard used in Administrative Procedure Act ("APA") cases to review the BCNR's decision. *Sharpe v. United States*, 935 F.3d 1352, 1358 (Fed. Cir. 2019). The Court's review is limited to assessing whether the BCNR's conclusions were "arbitrary, capricious, or in bad faith, or unsupported by substantial evidence, or contrary to law." *Heisig v. United States*, 719 F.2d 1153, 1156 (Fed. Cir. 1983) (quoting *Clayton v. United States*, 225 Ct. Cl. 593, 595 (1980)); *see Barnes v. United States*, 473 F.3d 1356, 1361 (Fed. Cir. 2007). Under this standard, the Government is entitled to a "strong, but rebuttable, presumption that the administrators of the military, like other public officers, discharge their duties correctly, lawfully, and in good faith." *Doe v. United States*, 132 F.3d 1430, 1434 (Fed. Cir. 1997) (quoting *Sanders v. United States*, 594 F.2d 804, 813 (Ct. Cl. 1979)). This standard is especially deferential in cases "pertaining to the military and national defense." *Voge v. United States*, 844 F.2d 776, 779 (Fed. Cir. 1988) (citing *Rostker v. Goldberg*, 453 U.S. 57, 70 (1981)).

Because the scope of judicial review is "narrow," the Court assesses "only whether [the agency] examined 'the relevant data' and articulated 'a satisfactory explanation' for [its] decision, 'including a rational connection between the facts found and the choice made.'" *Sharpe*, 935 F.3d at 1358 (alteration in original) (quoting *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2569 (2019)). It may not "substitute [its] judgment for that of [the agency], but instead must confine [itself] to ensuring that [the agency] remained 'within the bounds of reasoned decisionmaking.'" *Id.* (quoting *Dep't of Commerce*, 139 S. Ct. at 2569).

### III.  DISCUSSION

Plaintiff advances four challenges to the lawfulness of the BCNR's decision.  First, Plaintiff argues that the constructive service doctrine precludes his retroactive release from active duty. Second, he argues that the BCNR's determination ignored and misapplied applicable regulations. Third, Plaintiff contends that the BCNR's conclusion that he would have been involuntarily released on April 17, 2017, was arbitrary, capricious, and unsupported by the record.  Fourth, Plaintiff argues that the BCNR erroneously denied him consideration for promotion and reimbursement for out-of-pocket medical expenses.  Except with respect to the April 17 release date, Plaintiff's arguments fail.

### A.    The Constructive Service Doctrine Does Not Prevent the BCNR from Backdating Plaintiff's Release from Active Duty.

Plaintiff contends that the BCNR's decision contravenes the constructive service doctrine. ECF No. 46 at 19–25.  When a court determines that the military has unlawfully discharged a service member, the court applies the constructive service doctrine to return the service member "to the position that they would have occupied 'but for' their illegal release from duty."  *Barnick v. United States*, 591 F.3d 1372, 1379 (Fed. Cir. 2010) (quoting *Dilley v. Alexander*, 627 F.2d 407, 413 (D.C. Cir. 1980)); *Christian v. United States*, 337 F.3d 1338, 1344 (Fed. Cir. 2003) (holding that successful military pay claimants "are entitled to be placed in the same position they would have been in . . . but not in a better position").  The doctrine is a "legal fiction."  *Christian*, 337 F.3d at 1347 (quoting *Dilley*, 627 F.2d at 413).  To apply it, courts identify the date on which the service member would have been lawfully separated and deem the service member to have served on active duty from the time of his illegal separation until that date.  *See id.*  Awards of constructive service are ordinarily reviewed under the same standard as other BCNR decisions.  *See Barnick*,

7

591 F.3d at 1380–81 (applying the arbitrary and capricious standard to a military board's denial of constructive service).

The parties agree that Plaintiff is entitled to constructive service credit from the time of his unlawful discharge to the time of his lawful release. *See* ECF No. 46 at 20; ECF No. 50 at 5–6. The parties also agree that the BCNR has the authority to backdate discharges. *See* ECF No. 47 at 25; ECF No. 48 at 7; *see also Barnick*, 591 F.3d at 1380–81 (holding that a military board's decision to backdate a service member's discharge, thereby denying him constructive service, was not arbitrary, capricious, or contrary to law). The real point of dispute appears to be whether the BCNR's determination that the Secretary would have involuntarily released Plaintiff prior to him reaching 20 years of active duty service was arbitrary, capricious, or contrary to law. In many ways, the dispute is duplicative of the arguments for and against the BNCR's determination of the constructive release date, which are addressed elsewhere in this Opinion. *See infra* §§ III.B–C.

To the extent Plaintiff raises a separate argument specific to the constructive service doctrine, it is unavailing. He contends that the sanctuary provision and the constructive service doctrine, taken together, prevent the BCNR from backdating Plaintiff's release to a date within the sanctuary period—*i.e.*, before he at least became eligible for an active duty retirement. ECF No. 46 at 19–25. Plaintiff relies on several cases involving a similar sanctuary provision where the courts concluded that the plaintiffs should have entered the sanctuary zone but for their unlawful release, and thus they would have been retained on active duty until they reached 20 years of active duty service. *See id.* at 23–24 (citing *Pope v. United States*, 162 Fed. Cl. 566 (2022); *Carmichael v. United States*, 66 Fed. Cl. 115 (2005)). In those cases, the specific language of the sanctuary provision, 10 U.S.C. § 1176(a), impacted the determination of the date of the service member's lawful discharge. *See Pope*, 162 Fed. Cl. at 583–84; *Carmichael*, 66 Fed. Cl. at 128.

8

Section 1176(a) applies to regular enlisted service members, not members of a Reserve component like Plaintiff.  It mandates that an enlisted member who is within two years of qualifying for retirement (or transfer to the Fleet Reserve or Fleet Marine Corps Reserve) be retained on active duty until he reaches retirement (or is eligible for transfer).  10 U.S.C. § 1176(a).  But unlike § 12686(a), it does not provide for an exception allowing the Secretary to approve involuntary release during sanctuary.  Instead, the exception under § 1176(a) is limited to circumstances where "the member is sooner retired or discharged under any other provision of law."  *Id.*  In both *Pope* and *Carmichael*, there were no allegations that any other provision would have allowed for the plaintiffs' separation.  *See Pope*, 162 Fed. Cl. at 583 (noting the lack of facts or argument suggesting the plaintiff would have otherwise been discharged); *Carmichael*, 66 Fed. Cl. at 128 (finding the plaintiff was on track to reach 20 years).  Neither of these cases created nor applied a categorical rule that, when a sanctuary provision applies, courts must conclude that the service member would have remained on active duty for the duration of the sanctuary period.  Rather, the cases merely put the service member in the position they would be in but for their unlawful discharge under a materially distinguishable sanctuary provision.  *See id.*

What these cases do illustrate is that the constructive service doctrine bars retroactive release only to the extent that a sanctuary statute itself would have prevented the plaintiff's involuntary release from active duty.  If, as Plaintiff acknowledges, the Secretary could have involuntarily released Plaintiff after the PEB notified him on April 17, 2017, that he was fit for duty, the constructive service doctrine does not prevent the BCNR from retroactively concluding that the Secretary would have done so.[3]  Such a conclusion would merely place Plaintiff in the

---

[3] Notably, Plaintiff concedes that the Secretary could have involuntarily released him in 2017 had he entered sanctuary on further active duty orders.  ECF No. 46 at 24 ("Hypothetically,

same position he would have been in but for the USMC's unlawful action—not a better one. *See Sharpe*, 935 F.3d at 1359.

In sum, the constructive service doctrine did not prevent the BCNR from backdating Plaintiff's involuntary release.

**B.    The Secretary's Decision to Involuntarily Release Plaintiff Would Not Have Violated Applicable Regulations.**

Plaintiff also argues that the BCNR's decision contravened two regulations.  First, Plaintiff argues that SECNAVINST 1920.6C permits the Secretary to involuntarily release reservists with sanctuary status only in cases of disability or separation for cause, and this is not such a case. Second, Plaintiff argues that MCO 1800.11 permits involuntary release of reservists only if they inadvertently enter sanctuary, and Plaintiff's entry into sanctuary was not inadvertent.  Having considered the parties' dueling interpretations, the Court finds that the BCNR's conclusion that the Secretary would have exercised his authority under § 12686(a) to involuntarily release Plaintiff notwithstanding his sanctuary status is not contrary to the applicable regulations.

1.    <u>10 U.S.C. § 12686(a) Imposes Limitations on the Secretary's Authority to Involuntarily Release Reservists.</u>

As an initial matter, although Plaintiff does not challenge the BCNR's decision on the basis that it violates § 12686(a), the Court must construe the statutory provision that the BCNR relied on in making its determination.  This is because "[a]ny and all authority pursuant to which an agency may act ultimately must be grounded in an express grant from Congress." *Killip v. Off. of Pers. Mgmt.*, 991 F.2d 1564, 1569 (Fed. Cir. 1993).

---

the Navy would have been free to exercise the removal provision in Section 12686 if LtCol Faerber's orders had not been unlawfully terminated before he reached sanctuary.").

As Plaintiff correctly argues, the statute imposes two relevant limitations on a military department's ability to involuntarily release reservists.  First, the statute requires that reservists with sanctuary status be involuntarily released pursuant to regulations promulgated by the relevant Secretary, and that those regulations shall be "as uniform as practicable."  10 U.S.C. § 12686(a); *see Roberts v. Vance*, 343 F.2d 236, 240 (1964).  Second, it requires that the relevant Secretary approve such releases.  *Roberts*, 343 F.2d at 240 ("We think Congress' special concern for the 18-year reservist requires us to avoid such speculation and to hold that it intended secretarial approval in addition to the safeguards accorded reserve officers generally.").

The statute does not, however, delineate the grounds on which a secretary may approve involuntary release.  Contrary to the Government's assertion, this does not mean that the Secretary has plenary authority under the statute to release any sanctuary-zone reservist at any time for any reason.  *See* ECF No. 50 at 10.  Indeed, the provision is entitled "Limitations."  10 U.S.C. § 12686(a); *see Strickland v. United States*, 61 Fed. Cl. 689, 690 (2004) ("[A]s a matter of law, neither the Navy nor the Secretary can expand the agency or the Secretary's authority by regulation.").  Rather, the statute requires that such releases be made pursuant to regulations, and thus the Court must look to the regulations to determine whether and in what circumstances such releases may be approved.  *See Roberts*, 343 F.2d at 240.

## 2.   The BCNR's Decision Did Not Violate SECNAVINST 1920.6C.

With this statutory construction in mind, the Court turns to SECNAVINST 1920.6C, which "provides for the discharge, termination of appointments, release from active duty, retirement for length of service, and dropping from the rolls of Navy and Marine Corps officers," including officers of the Reserve components of the Navy and the USMC.  Administrative Separation of Officers, SECNAVINST 1920.6C, ¶ 4(a) (2005).  Plaintiff argues that the BCNR erred in failing

to consider and apply SECNAVINST 1920.6C because the instruction limits involuntary release to two circumstances—disability and separation for cause—neither of which are present in this case.  ECF No. 46 at 25–28.  The Court agrees that the BCNR should have considered this instruction, but its failure to do so was harmless.  The instruction does not limit involuntary release of sanctuary-zone reservists in the way Plaintiff suggests.

Plaintiff relies on a provision of SECNAVINST 1920.6C that appears in a list of "statutory limitations [that] exist regarding the release of Reserve officers from active duty."  SECNAVINST 1920.6C, Encl. (3), ¶ 7(b).  The provision reads:

> Under section 12686 of [Title 10], Reserve officers who are on active duty (other than for training) and have completed 18 or more years of active service shall not be involuntarily released from that duty except in the case of physical disability or separation for cause before they become eligible for retired pay, other than under the retirement system in Chapter 1223 of [Title 10], unless their release is approved by SECNAV.[4]

*Id.* ¶ 7(b)(3).  Under Plaintiff's reading, the instruction permits the Secretary to involuntarily release reservists with sanctuary status only in two circumstances: when the reservist is found to be disabled or when the reservist has been separated for cause.  ECF No. 46 at 26.  In both circumstances, secretarial approval is also required.  *Id.*  The Government responds that the regulation permits involuntary release in three circumstances: when the reservist is found to be disabled, when the reservist has been separated for cause, or in any case where the Secretary has authorized the reservist's involuntary release.  ECF No. 47 at 28–29.  Each party argues that the plain language compels its reading.

The Court agrees with the Government's interpretation of the regulation, as awkwardly constructed as it may be.  The provision generally prohibits involuntary release and includes one

---

[4] The instruction defines "SECNAV" as "[t]he Secretary of the Navy."  SECNAVINST 1920.6C, Encl. (1), ¶ 43.

phrase and one clause that create exceptions.  The first part of the provision states the general rule: pursuant to the statute, certain reserve officers may not be involuntarily released from active duty once they have accumulated 18 years of active duty service.  SECNAVINST 1920.6C, Encl. (3), ¶ 7(b)(3).  That rule contains an exception permitting the release of sanctuary-zone officers in cases of disability or separation for cause.  *Id.*  The final clause of the paragraph creates an exception to the general rule.  It allows officers to be released in circumstances (not involving disability or separation for cause) where the Secretary has approved their release.  *Id.*  In other words, under the regulation, secretarial approval is an exception to a rule that itself includes an exception.

Plaintiff, on the other hand, purports to invoke the rule of the last antecedent in support of his interpretation.  ECF No. 46 at 27.  When a list of terms or phrases is followed by a modifying clause, one of two semantic canons can apply: the rule of the last antecedent and the series-qualifier canon.  *See Lockhart v. United States*, 577 U.S. 347, 351 (2016) ("When this Court has interpreted statutes that include a list of terms or phrases followed by a limiting clause, we have typically applied an interpretive strategy called the 'rule of the last antecedent.'"); *Facebook v. Duguid*, 141 S. Ct. 1163, 1169 (2021) (explaining the series-qualifier canon) ("Under conventional rules of grammar, '[w]hen there is a straightforward, parallel construction that involves all nouns or verbs in a series,' a modifier at the end of the list 'normally applies to the entire series.'") (alteration in original) (quoting A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 147 (2012)).  Simply put, the rule of the last antecedent provides that the modifier at the end of a list applies only to the final item in the list, *see Lockhart*, 577 U.S. at 351, while the series-qualifier canon provides that the modifier at the end of a list applies to each item in the list, *see Facebook*, 141 S. Ct. at 1169.

Neither canon applies here because the modifying clause—"unless their release is approved by [the Secretary]"—does not follow a list of terms or phrases.  *See* SECNAVINST 1920.6C, Encl. (3), ¶ 7(b)(3); *see also Facebook*, 141 S. Ct. at 1169; *Lockhart*, 577 U.S. at 351.  Rather, there is only one item for the clause to modify: the entirety of the sentence preceding it.  Indeed, on this point, both parties agree.  ECF No. 47 at 29; ECF No. 46 at 27.  And, as explained, the preceding part of the sentence that is modified by the clause includes a phrase providing an exception to the general rule.  To accept Plaintiff's interpretation, one must insert a conjunction before the modifier such that the final clause provides another condition to the exception.  That is, the word "unless" must be replaced by the phrase "and unless."  ECF No. 48 at 9.  Only with that revision would the regulation plainly limit involuntary release to cases of disability and separation for cause, *and* in both instances require Secretarial approval.  On occasion, drafters may omit a conjunction using a technique known as asyndeton.  *O'Connor v. Oakhurst Dairy*, 851 F.3d 69, 76 (1st Cir. 2017) (describing asyndeton as a "nonstandard grammatical device").  However, the use of asyndeton is rare and, according to one authority on interpretation, to be avoided.  *See* Scalia & Garner, *supra*, at 119.  Additionally, it typically arises in the context of a list, *see id.* (showing example), which is not applicable here.  The Court declines to rewrite the Navy's regulation to accommodate Plaintiff's interpretation.

Plaintiff also attempts to support his interpretation by referencing a newer version of the regulation, SECNAVINST 1920.6D (2019).  *See* ECF No. 48 at 13.  The new instruction provides:

> Reserve O-2s to O-6s: On Active Duty Within Two Years of Eligibility for Retired or Retainer Pay. In accordance with [Title 10], section 12686, a Reserve officer who is on active duty (other than for training) and is within two years of becoming eligible for retired pay or retainer pay under a military retirement system other than the system under [Title 10], chapter 1223 (retired pay for non-Regular service), cannot be involuntarily released from active duty before becoming eligible for such pay unless the SECNAV or designee approves the release.  Officers who are retained on active duty under this provision may not be removed from an active status while they are on that active duty, except when

separated for cause or physical disability, or if eligible for retired pay under [Title 10], section 12731.

SECNAVINST 1920.6D, Encl. (5), ¶ 5(e).  SECNAVINST 1920.6C contains a related provision, which Plaintiff does not raise in support of his motion.  *See* SECNAVINST 1920.6C, Encl. (3), ¶ 2(b)(6)(d) (addressing § 12686 under paragraph discussing failure of selection for promotion).[5]

The new regulation does not change the Court's conclusion that SECNAVINST 1920.6C does not limit the release of sanctuary-zone reservists to only cases of disability or separation for cause.  As an initial matter, the new regulation was not in effect at the time that the Secretary would have involuntarily released Plaintiff, and thus it would not have applied.  And in any event, Plaintiff has failed to demonstrate that the provision he relies upon in the new regulation imposes the same purported limits.  The first sentence of the provision merely reiterates the protection that the sanctuary statute affords.  *See* SECNAVINST 1920.6D, Encl. (5), ¶ 5(e).  The second sentence, which Plaintiff principally relies on, authorizes the removal of sanctuary-zone reservists from "an active status while they are on that active duty" under the three circumstances listed.  *Id.*  Plaintiff does not explain whether there is a distinction between release from active duty, as is the case here, and removal from active status while on active duty.  The instruction separately defines the two terms.  *Id.*, Encl. (1), ¶¶ 2, 6; *see id.* ¶ 28.  Nor does Plaintiff address the fact that the newer regulation references a third exception (in addition to disability and for-cause separation)

---

[5] The provision reads in full:
Per section 12686 of [Title 10], unless specifically authorized by SECNAV, Reserve officers on active duty (other than for training) who are within 2 years of qualifying for retirement under section 6323 of [Title 10] on the date on which they would otherwise be removed from an active status, shall not be involuntarily released from active duty before qualifying for retirement under that section. Officers who are retained on active duty under this provision may not be removed from an active status while they are on that active duty, except when separated for cause or physical disability.

authorizing the Secretary to remove from active status reservists who are eligible for non-regular retirement under 10 U.S.C. § 12731.

Finally, Plaintiff argues that the Government's interpretation must fail because, if the clause requiring secretarial approval does not apply to cases of disability and separation for cause, it is inconsistent with the statute's requirement that the Secretary approve the involuntary release of all reservists with sanctuary status. ECF No. 48 at 9–10. To harmonize the provision with the statute, Plaintiff argues that the final clause ("unless their release is approved by [the Secretary]") reiterates the statute's secretarial approval requirement, rather than providing an independent basis for involuntary release in cases other than disability or separation for cause. *Id.*

The Government responds that Secretarial approval is required to involuntarily release reservists in cases of disability and separation for case, so releasing reservists with sanctuary status under those authorities does not contravene § 12686(a). ECF No. 50 at 11–12. The statute does not plainly indicate whether the secretarial approval required to involuntarily release a sanctuary-zone reservist must be separate from or in addition to the secretarial approval required to release reservists under other provisions of law.[6] And, as the Government explains, the disability and separation for cause exceptions clarify that only the approval obtained from the Secretary in the disability and separation for cause process is required in those cases. *Id.* at 11.

In sum, the relevant provision of SECNAVINST 1920.6C neither authorizes the Secretary to involuntarily release reservists, nor imposes limitations beyond the scope of the statute itself. Instead, it merely reiterates and references two bases for involuntary release that are premised on other provisions of law. The reference to those sets of regulations does not prevent the Secretary

---

[6] To the extent there is ambiguity in the statute, the Court need not resolve the question here because the BCNR did not determine that Plaintiff would have been involuntarily released due to disability or separation for cause.

(or his designee) from promulgating other regulations pursuant to which reservists may be involuntarily released.  Because the provision does not limit involuntary release to only cases of disability or separation for cause, the BCNR's decision did not contravene the instruction on that basis.

        3.     <u>The BCNR's Decision Was Consistent with MCO 1800.11.</u>

Plaintiff also challenges the BCNR's decision on the basis that it violates MCO 1800.11, which authorizes the USMC to seek secretarial approval for involuntary release when a reservist inadvertently enters sanctuary.  *See* ECF No. 46 at 28.  The regulation provides, in relevant part: "[Reserve Component] Marines who inadvertently receive orders or extensions to orders that place them in sanctuary without DC M&RA approval are advised that the DC M&RA may request that the [Secretary of the Navy] involuntarily release the [Reserve Component] marine from active duty during the sanctuary period."[7]  Policy and Procedures for Reserve Component (RC) Member Service Beyond 16 Years of Active Duty Service, MCO 1800.11, Encl. (1), Ch. 1, ¶ 4(l) (2009). As the Court recently explained, MCO 1800.11 is the Secretary-affirmed instruction addressing the USMC's "sanctuary considerations."  *Marshall v. United States*, 164 Fed. Cl. 580, 585 (2023) (internal quotation marks omitted) (quoting Policy and Procedures for Reserve Component (RC) Member Service Beyond 16 Years of Active Duty Service, SECNAVINST 1800.2, ¶ 3.d (2008)).

Plaintiff argues that the inadvertence ground in MCO 1800.11 creates an additional limitation, meaning a sanctuary-zone reservist can only be involuntarily released (1) with

---

       [7] MCO 1800.11 is the USMC equivalent of Navy policies governing sanctuary for Navy reservists.  Specifically, Office of the Chief of Naval Operations Instruction ("OPNAVINST") 1001.27 similarly advises that reserve sailors who enter sanctuary without the required approval may be referred for "involuntary release via the Secretarial process."  Policy and Procedures for Reserve Component Sailors Service Beyond 16 Years of Active-Duty Service, OPNAVINST 1001.27, ¶ 6(d) (2013).

secretarial approval, (2) if he is found to be disabled or separated for cause, *and* (3) his entry into the sanctuary zone was inadvertent.  *See* ECF No. 46 at 25–26, 28.  As an initial matter, there is some tension between Plaintiff's interpretation of this provision and his interpretation of SECNAVINST 1920.6C.  Both disability and separation for cause seem to present cases where a reservist entered sanctuary by design and some subsequent event (like injury or misconduct) resulted in their involuntary release.  For example, if a reservist enters sanctuary and later becomes disabled, the reservist's planned entry into sanctuary could not be accurately described as inadvertent.  Further, MCO 1800.11 principally concerns the process for approving active duty orders that place reservists into sanctuary.  Approval of such orders has nothing to do with disability or separation for cause, and there is no language in MCO 1800.11 applying the inadvertence ground exclusively to cases of disability or separation for cause.

Contrary to Plaintiff's interpretation, the provision does not impose an additional limitation, but rather authorizes the USMC to request that the Secretary involuntarily release reservists in the case of inadvertence.  Read in that way, MCO 1800.11 is in harmony with SECNAVINST 1920.6C, and the Secretary's approval in such circumstance would fall within the exception stated in the final clause of the instruction.  *See Marshall*, 164 Fed. Cl. at 596 (citing *BlackLight Power, Inc. v. Rogan*, 295 F.3d 1269, 1273 (Fed. Cir. 2002); *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992)) (explaining that a court must, if possible, choose a harmonious interpretation).

In any event, Plaintiff also argues that his entry into sanctuary was not inadvertent.  ECF No. 46 at 28.  The Court therefore turns to the question of whether, but for his unlawful release, Plaintiff would have "inadvertently received orders or extensions to orders" putting him into sanctuary.  *See* MCO 1800.11, Encl. (1), Ch. 1, ¶ 4(l).  MCO 1800.11 itself does not define

inadvertence.  *See generally id.*, App'x A.  According to Plaintiff, a reservist may inadvertently attain sanctuary status through an "administrative or clerical oversight or error," which is not the case here.  ECF No. 46 at 28.  This is consistent with the Black's Law Dictionary definition of the term as "[a]n accidental oversight; a result of carelessness."  Black's Law Dictionary 827 (10th ed. 2014).

The other definition Plaintiff provides, however, defines the term as something unintended. *See* ECF No. 46 at 28 n.12.  Where, as here, further active duty orders are compelled by other regulations, in this case DoDI 1241.01, and the Secretary's waiver authority does not apply, such orders might result in a reservist reaching sanctuary inadvertently.  That is especially true in the context of Medical Hold, because injuries resulting in Medical Hold status are unanticipated, *see* AR 673 (describing reservists' placement on Medical Hold as "unexpected"), and the duration of the Medical Hold process for each reservist is variable.  Neither Plaintiff nor the USMC expected Plaintiff to be injured in the line of duty, within months of his original end of active service date. And on April 1, 2016, when he was initially placed on Medical Hold, neither Plaintiff nor the USMC could predict (let alone intend) that Plaintiff's treatment and disability evaluation would keep him on active duty past 18 years.

The BCNR's determination is therefore consistent with MCO 1800.11, and the BCNR properly relied on that policy in concluding that the Secretary would have involuntarily released Plaintiff.[8]

---

[8]  The Court, however, must disagree with the BCNR's statement that Plaintiff "inadvertently reached sanctuary status . . . due to [this Court's] ruling."  AR 635.  What would have caused Plaintiff to enter sanctuary, but for his unlawful release, is not the ruling itself but the underlying facts and law on which the ruling is based—*i.e.*, Plaintiff's injury and prolonged time on Medical Hold, DoD's policy to retain reservists for medical treatment or disability processing, as well as the inapplicability of the Secretary's sanctuary waiver authority to his further orders.

**C.**     **The BCNR Rationally Determined that Plaintiff Would Have Been Involuntarily Released but Erred in Denying Him Constructive Service for Out-Processing.**

Having found the BCNR's conclusion that the Secretary would have involuntarily released Plaintiff is not contrary to law, the Court must next determine if the BCNR's conclusion was arbitrary, capricious, or unsupported by the record.  The Court holds that the BCNR rationally determined that the USMC would have sought secretarial approval for Plaintiff's involuntary release and reasonably concluded that the Secretary would have given approval.  However, the selection of April 17, 2017, as his release date is not supported by the record.  Rather, the evidence demonstrates that Plaintiff would have remained on active duty for up to 10 working days following the PEB's determination.  As such, he should have been awarded constructive service for that additional time.

   1.     <u>The BCNR Rationally Concluded that Plaintiff Would Have Been Involuntarily Released, and that Conclusion is Supported by the Administrative Record.</u>

The Court first assesses whether the BCNR irrationally concluded that the Secretary would have exercised his discretion to involuntarily release Plaintiff.  Throughout this litigation, the Government has consistently taken the position that reservists should not obtain a regular retirement merely because they were placed on Medical Hold, were retained on active duty for that purpose, and reached sanctuary as a result.  AR 673; ECF No. 47 at 32–33.  Both the USMC and Navy have implemented policies designed to carefully control the entry of reservists into sanctuary.  AR 673; *see* MCO 1800.11, Encl. (1); OPNAVINST 1001.27, Encl. (3).  These policies require the USMC to "screen active duty orders" and obtain approval from the DC M&RA before issuing orders that would put the reservist into sanctuary.  AR 673; *see* SECNAVINST 1800.2, ¶

---

The Board acknowledged these facts and policies in its decision, emphasizing the unexpected nature of Medical Hold status in its discussion of policy concerns.  AR 665–68, 670–71, 673.

3; MCO 1800.11, Encl. (1), Ch. 1, ¶ 4(l).  The USMC affirmatively selects reservists who "possess unique or critical skills to meet mission requirements" for sanctuary.  MCO 1800.11, Encl. (1), Ch. 3, ¶ 1; *see id.* Figure 3-1 (showing the process for a reservist to request and be selected for sanctuary eligibility).  These policies serve a "critical purpose" by "enabl[ing] the Navy and Marine Corps to exercise control of its manpower and budgeting," and by "remov[ing] an incentive for such members to malinger . . . in order to ensure entitlement to a regular retirement which they otherwise would not earn."  AR 673.

The BCNR reasonably concluded that, consistent with Navy and USMC policies, the Secretary should have and would have involuntarily released Plaintiff had he entered sanctuary due to his Medical Hold status.  *Id.*  In this case, Plaintiff would have reached sanctuary based on the USMC's obligation to retain him on active duty to facilitate his Medical Hold (and its inability to condition his consent to further orders on a sanctuary waiver), rather than through the USMC's selection process.  The BCNR clarified that it was "not questioning the validity of [Plaintiff's] injury or suggesting that" Plaintiff intended to malinger on medical hold in order to obtain a regular retirement.  *Id.*  It rationally concluded, however, that allowing Plaintiff to remain in sanctuary in these circumstances would nonetheless "undermine . . . critical policies and establish an unsustainable precedent for the Marine Corps."  *Id.*

Plaintiff raises several challenges to this conclusion, none of which are successful.  He argues that the record does not support the BCNR's conclusion that the Secretary would have used his discretion to involuntarily release Plaintiff, largely relying on *Murphy v. United States*, 22 Cl. Ct. 147 (1990).  *See* ECF No. 46 at 29–30.  In *Murphy*, the court held that the Secretary of the Air Force would not have exercised his discretion to involuntarily release a reservist on the date he became eligible for retirement pursuant to an Air Force policy identifying the objectives of its

Indefinite Reserve (career) Status program.  22 Cl. Ct. at 150.  The court faulted the Government for failing to provide proof of other instances "in which the Secretary uniformly took such discretionary action under [the policy] in circumstances similar to those here involved."  *Id.*  The court also expressed skepticism that the Secretary would have involuntarily released the plaintiff "given his exemplary record and the Air Force's expressed need for officers in plaintiff's category of expertise."  *Id.*

This case, however, sits in a different procedural posture than *Murphy*, and a different standard therefore applies to the BCNR's determination that the Secretary would have involuntarily released Plaintiff.  The *Murphy* court assessed the arguments made by the Government in the course of the litigation and decided the issue de novo, rather than reviewing a decision by a military board.  *See* 22 Cl. Ct. at 156.  Here, by contrast, the BCNR has made a determination that Plaintiff would have been involuntarily released, and a far more deferential standard applies.  *See Sharpe*, 935 F.3d at 1358.

Even taking the factors *Murphy* relied on into consideration, the record supports the BCNR's determination.  Plaintiff's record of service is, indeed, exemplary.  *See* AR 1394–1410. The BCNR concluded that the record "clearly established [Plaintiff's] favorable character, competency, and work ethic."  AR 674.  But the quality of Plaintiff's service record would not have been relevant to the Secretary's decision to involuntarily release him.  In fact, the BCNR considered Plaintiff's record in reaching its conclusion and nonetheless concluded that Plaintiff would have been involuntarily released for reasons wholly unrelated to the excellence of his service.  *Id.*  The Court "cannot substitute [its] judgment" for that of the BCNR, even if "reasonable minds could reach differing conclusions on the same evidence."  *Heisig*, 719 F.2d at 1156.

Similarly, Plaintiff correctly notes that the BCNR did not offer evidence of other instances where the Secretary has taken the same discretionary action in similar circumstances.  ECF No. 46 at 30.  Though such evidence would have provided additional support for the BCNR's conclusion, it is rational without evidence of comparators.  The record suffices to support the BCNR's determination that the Secretary would have involuntarily released Plaintiff, and the BCNR "provide[d] a rational explanation connecting its policy decision consistent with the law to the facts it considered."  *Pedden v. United States*, 145 Fed. Cl. 785, 800 (2019).  Nothing more is required.  Moreover, regardless of what was done in other cases, there is no need to speculate about how the decision-maker would assess Plaintiff's case.  Unlike in *Murphy*, the ASN M&RA reviewed and agreed with the BCNR's recommendations.  AR 676.

Plaintiff also contends that the BCNR erred in using the Government's interest in manpower and budget planning to justify involuntarily releasing Plaintiff.  ECF No. 48 at 15.  Because the USMC was aware that Plaintiff might reach sanctuary when it initially issued his orders in 2015, Plaintiff argues that the USMC should have planned for the possibility of Plaintiff's entry into sanctuary.  *Id.*; *see* AR 6, 433.  Plaintiff further argues that any planning or budgeting concerns that may have existed as of April 17, 2017, could not bear on the relief Plaintiff would obtain six years later.  *Id.*

This argument fails because the BCNR assessed the considerations that should and would have borne on the Secretary's decision at the time Plaintiff would have been released.  The BCNR appropriately did not consider whether budgetary impacts six years in the future would have influenced the exercise of the Secretary's discretion.  *See* AR 673.  What is more, the BCNR also expressed concern about the USMC's ability to effectively plan and budget for personnel generally given the obligation to retain reservists on active duty to facilitate Medical Hold (assuming the

criteria of DoDI 1241.01 are met).  *Id.*  This decision was driven not only by the effects of granting

relief to Plaintiff in the instant case, but also the overall effect that such precedent would have on

personnel management and budgeting generally.  *Id.*  The Court finds no error in the BCNR's

consideration of the Government's important policy objectives in reaching its conclusion that

Plaintiff should have been involuntarily released.

      Finally, Plaintiff argues that there was no evidence that the USMC would have asked the

Secretary to involuntarily release him.  To the contrary, the BCNR specifically addressed the

USMC's intent that Plaintiff not remain in sanctuary.  *See id.*  Based on the record, the BCNR

concluded that the USMC "intend[ed] to prevent [Plaintiff] from reaching sanctuary status due to

his medical hold status."  *Id.*  Based on the USMC's actions in the instant case and its regulations,

the BCNR reasoned that the USMC's "intention to pursue such a release under these

circumstances" was "clear."  *Id.*  The Court agrees.  Given the record in this case and the numerous

policies managing the entry of reservists into sanctuary, it is difficult to reach any other conclusion.

The Court takes Plaintiff's point that the same facts relied on by the BCNR—*i.e.*, the USMC's

conditioning of Plaintiff's further orders on the execution of a sanctuary waiver—are the same

facts supporting the Court's determination that his release was unlawful.  *See* ECF No. 46 at 14–

15.  But the USMC's attempts to secure a sanctuary waiver are probative of the *separate* question

of whether the USMC would have sought involuntary release had it ultimately issued the orders

placing Plaintiff in the sanctuary zone.  That evidence clearly shows that Plaintiff would not have

attained sanctuary status "by design."  SECNAVINST 1800.2, ¶ 3.

      2.    <u>The BCNR Erred in Selecting April 17, 2017, as the Date on Which Plaintiff
Would Have Been Involuntarily Released.</u>

      The Court must next assess whether the constructive release date selected by the BCNR

was rational and supported by the record.  The BCNR concluded that Plaintiff would have been

involuntarily released on April 17, 2017, upon being notified of his PEB determination.  AR 673–74; DoDI 1241.01, ¶ 3 (providing that qualifying service members will be retained on active duty until they are "found fit for duty").  Because there was no evidence that Plaintiff had been denied "travel and other miscellaneous days typically associated with the release from active duty," the BCNR did not grant Plaintiff any additional active duty time for out-processing.  AR 674.  Plaintiff argues that the Government would have had to take several administrative steps to request and obtain the Secretary's approval to involuntarily release him, and he expresses doubt that the Government could have completed the process in fewer than 30 days after Plaintiff reached sanctuary on March 25, 2017.  ECF No. 46 at 30–31.  The Government responds that Plaintiff waived any claim of entitlement to constructive service for out-processing by failing to raise the issue before the BCNR and that, in any event, Plaintiff would have had enough time to out-process between March 30, 2017, the date he accepted the informal PEB's initial findings, and April 17, 2017, the date the PEB determined that Plaintiff was fit for duty.  ECF No. 47 at 35–36 (citing *Marshall*, 164 Fed. Cl. at 592–93).

Although the Government does not respond to Plaintiff's arguments that the secretarial approval process would have taken additional time, Plaintiff provides no support for his claim that such a process consists of the steps he enumerates.  *See* ECF No. 46 at 30–31; ECF No. 48 at 17.  And the Government was unable to locate any Navy or USMC authorities that describe a formal secretarial approval process or procedure.  *See* Def.'s Notice at 1, ECF No. 53.  Plaintiff also provides no support for the contention that the USMC could not obtain approval in less than 30 days.  *See* ECF No. 46 at 31.  On its face, a 30-day timeframe does not strike this Court as unreasonable.  Accordingly, the Court lacks any basis to conclude that the BCNR irrationally

determined that the Secretary would have rendered his decision to involuntarily release Plaintiff by April 17, 2017.

There remains the question of how much out-processing time would have been provided to Plaintiff had he been involuntarily released effective April 17, 2017.[9] On this point, *Marshall* is instructive. In *Marshall*, which involved substantially similar facts and overlapping claims, the BCNR also "end[ed] Plaintiff's constructive service period on the date he was found fit for duty" by the PEB. 164 Fed. Cl. at 592–93. There, the BCNR acknowledged that "Marines do not typically leave active duty on the same day that they are found [fit for duty]." *Id.* at 591. Given the BCNR's obligation to put the plaintiff in the position he would have been in had the Government acted lawfully, the Court concluded that the BCNR erred in selecting an end date for the plaintiff's constructive service by "rel[ying] solely on the real-world facts surrounding his unlawful demobilization." *Id.* Instead, the administrative record indicated that the USMC had an informal policy of allowing 10 days for out-processing following a determination that a reservist was fit for active duty. *Id.* at 592. Accordingly, the Court held that the BCNR's decision to deny constructive service after the date the plaintiff had been found fit for duty was arbitrary and capricious. *Id.* at 592–93.

Here, the BCNR similarly relied on real-world facts in denying Plaintiff additional time for demobilization. Specifically, the BCNR denied constructive service for demobilization because there was no evidence that Plaintiff had been "denied such benefits upon his *actual* release from

---

[9] The Court disagrees that Plaintiff waived this argument, as he generally raised the issue of out-processing in his submissions to the BCNR. *See* AR 658. What is more, the BCNR decided the specific question sua sponte and in the first instance. *See Klingenschmitt v. United States*, 119 Fed. Cl. 163, 183 (2014) (explaining that the purpose of the waiver requirement is to "ensure that administrative agencies are 'afforded an opportunity to make adjustments and correct errors on the administrative level'" (quoting *Doyle v. United States*, 599 F.2d 984, 990 (Ct. Cl. 1979)), *aff'd*, 623 F. App'x 1013 (Fed. Cir. 2015).

active duty." AR 674 (emphasis added). As in *Marshall*, that "does not necessarily mean [Plaintiff] received the benefit of all or part of the relief he otherwise would have received" had his actual, unlawful release not occurred. 164 Fed. Cl. at 591. And just like *Marshall*, the record in the instant case indicates that reservists in a Medical Hold status who are found fit for active duty by the PEB will be released within 10 working days of the PEB's determination.[10] *See* AR 48, 205 (signed administrative counseling form affirming Plaintiff's understanding that he would be "release[d] from active duty within 10 working days" of a fit-for-duty determination). Accordingly, the Court holds that the BCNR's decision denying Plaintiff constructive service time for demobilization was arbitrary, capricious, and unsupported by the record. Plaintiff's constructive service credit should include up to 10 working days after his finding of fitness for active duty on April 17, 2017.

### D. The BCNR Rationally Rejected Plaintiff's Request for a Promotion and Reimbursement for Medical Expenses.

Plaintiff's remaining challenges to the BCNR's denial of further relief can be quickly disposed of. The BCNR reasonably concluded that it lacked the legal authority to convene an SSB and denied Plaintiff's request for promotion to O-6. AR 635–37. As the BCNR explained, "an SSB may be convened in the case of an officer who was not considered by a regularly scheduled promotion selection board (PSB) due to an administrative error or who was unfairly considered and not selected for promotion." AR 635 (citing 10 U.S.C. § 14502; SECNAVINST 1402.1). The BCNR found no evidence that Plaintiff had been unfairly denied promotion. AR 636. Further,

---

[10] However, contrary to Plaintiff's assertion (*see* ECF No. 46 at 31 n.13), he was not entitled to take terminal leave. *See* AR 48 ("Members returning to full duty will not be authorized terminal leave[.]"), 205 ("extensions for terminal leave will not be authorized"); *see also Marshall*, 164 Fed. Cl. at 592.

the BCNR found no evidence that Plaintiff's unlawful release from active duty prevented him from being considered for promotion. AR 635.

That is because Plaintiff would not have been considered for promotion until October 3, 2017, almost six months after his involuntary release date of April 17, 2017. *Id.* Plaintiff's argument that he is entitled to an SSB relies on the premise that he would have continued on active duty past October 3, 2017. *See* ECF No. 46 at 32 n.16. Though the Court concludes that Plaintiff is entitled to some additional constructive service credit, that additional time would not put Plaintiff beyond (or even close to) the date on which he would have been considered for promotion. *See supra* § III.C.2. Thus, the BCNR did not err in denying Plaintiff's request for promotion.

Finally, the BCNR did not err in denying Plaintiff reimbursement of out-of-pocket medical expenses. Although the BCNR declined to order reimbursement, it concluded that Plaintiff could seek reimbursement for his expenses from the Defense Health Agency based on the Board's record correction. AR 636. Plaintiff clarifies that that he does not seek reimbursement directly from the BCNR, but instead "requests that the Court direct the appropriate party" to reimburse him. ECF No. 48 at 18. He does not cite any regulation or judicial decision establishing the Board's authority to do so. As the Court recently explained in *Marshall*, "the role of the BCNR is 'to correct any Navy record when "necessary to correct an error or remove an injustice."'" 164 Fed. Cl. at 593 (quoting *Viet. Veterans of Am. v. Sec'y of the Navy*, 843 F.2d 528, 531 (D.C. Cir. 1988)); *see* 10 U.S.C. § 1552(a)(1) ("The Secretary of a military department may correct any military record of the Secretary's department when the Secretary considers it necessary to correct an error or remove an injustice."). Once final, the BCNR's decision or recommendation "provides the basis for the settlement of any monetary portion of an applicant's claims." *Marshall*, 164 Fed. Cl. at 593; *see* 10 U.S.C. § 1552(c)(1). In other words, Plaintiff may now seek reimbursement for his out-of-

pocket expenses from "the appropriate channels."  ECF No. 50 at 19; *see* ECF No. 47 at 38; AR

636.  The BCNR did not err in denying Plaintiff's requested relief.

## IV.  CONCLUSION

For these reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Plaintiff's

Motion for Judgment on the Administrative Record (ECF No. 46) and **GRANTS IN PART** and

**DENIES IN PART** Defendant's Cross-Motion for Judgment on the Administrative Record (ECF

No. 47).

On or before **February 7, 2024**, the parties shall file a joint status report proposing

appropriate steps consistent with this Opinion, including determination of the amount of backpay

and any other payment owed to Plaintiff, and a schedule for post-judgment proceedings should

they be necessary.  The Court sees two possible options for "next steps":

1. The Court remands this matter to the Navy with instructions to correct Plaintiff's records, consistent with this decision, such that he is deemed to have continued on active duty for 10 working days after April 17, 2017, and to direct the Defense Finance and Accounting Service to calculate the sum owed to Plaintiff for the purpose of this Court entering final judgment at a later date.  *See* Order, *Keltner v. United States*, No. 19-663 (June 13, 2023), ECF No. 80.

2. The parties meet and confer to reach an agreement on the sum owed to Plaintiff.  Upon the parties' request, the Court will enter a final judgment directing the Navy to correct Plaintiff's records, consistent with this decision, such that he is deemed to have continued on active duty for 10 working days after April 17, 2017, and directing the Government to pay Plaintiff the stipulated monetary award.  *See* Joint Status Report, *Marshall v. United States*, No. 18-cv-549 (July 10, 2023), ECF No. 71.

The parties are free to propose other approaches.

**SO ORDERED**.


Dated: January 24, 2024                              */s/ Kathryn C. Davis*
                                                     KATHRYN C. DAVIS
                                                     Judge